# EXHIBIT 1

ATTORNEY GENERAL OF THE STATE OF NEW YORK
REAL ESTATE FINANCE BUREAU
------------------------------------------------------------x

In the Matter of,

**Investigation by ERIC T. SCHNEIDERMAN,**
**Attorney General of the State of New York, of**

IAN BRUCE EICHNER, LESLIE H. EICHNER,     :
STUART P. EICHNER, SCOTT L. LAGER,       :  Assurance
T. PARK CENTRAL LLC, O. PARK CENTRAL LLC, :  No. 17-149
PARK CENTRAL MANAGEMENT, LLC,         :
MANHATTAN CLUB MARKETING GROUP, LLC,  :
and NEW YORK URBAN OWNERSHIP
MANAGEMENT, LLC,

                   Respondents.
------------------------------------------------------------x

## ASSURANCE OF DISCONTINUANCE

The Office of the Attorney General of the State of New York ("OAG") commenced an investigation pursuant to the Martin Act, New York General Business Law §§ 352 *et seq.*, and Executive Law § 63(12), and commenced a proceeding pursuant to GBL § 354 relating to the alleged conduct of T. Park Central LLC ("T. Park"), O. Park Central LLC ("O. Park," and with T. Park, "Sponsors"), Park Central Management, LLC ("Park Central"), Ian Bruce Eichner, Leslie H. Eichner, Stuart P. Eichner, Scott L. Lager, Hospitality Advisors, LLC ("Hospitality Advisors") New York Urban Ownership Management, LLC ("Urban"), and Manhattan Club Marketing Group LLC ("Manhattan Club Marketing") (collectively, "Respondents") in connection with the offer and sale of certain interests in the timeshare known as The Manhattan Club, located at 200 West 56th Street, which was organized to "manage, operate and maintain a timeshare use plan." This Assurance of Discontinuance ("Assurance") contains the findings of the OAG's investigation and the relief agreed to by the OAG and the Respondents (collectively, the "Parties").

1

## FINDINGS

### I.     The Respondents

1.     Respondent Ian Bruce Eichner is an individual whose business address is 30 West 21st Street, 11th Floor, New York, New York 10010, and who is the brother of Respondent Stuart Eichner.  Ian Bruce Eichner is the manager of Urban and the managing member of Manhattan Club Marketing.

2.     Respondent Leslie Eichner is an individual whose business address is 30 West 21st Street, 11th Floor, New York, New York 10010, and who is a member of Urban.

3.     Respondent Stuart Eichner is an individual whose business address is 30 West 21st Street, 11th Floor, New York, New York 10010, and who is the brother of Ian Bruce Eichner.  (Ian Bruce Eichner, Leslie Eichner, and Stuart Eichner are collectively referred to herein as the "Eichner Respondents").  Stuart Eichner was, at relevant times, the President of The Manhattan Club and a member of Urban.

4.     The Eichner Respondents are members and principals of Respondents T. Park and O. Park.

5.     The Eichner Respondents are the managing members of Park Central.

6.     Respondent Scott L. Lager ("Lager") is an individual whose business address is 200 West 56th Street, New York, New York 10019, and who was, at relevant times, the Vice President of The Manhattan Club Timeshare Association, the entity that was responsible for the management and day-to-day operations of The Manhattan Club.  (Lager, together with the Eichner Respondents, are collectively referred to herein as the "Individual Respondents").

7.     Respondent Stuart Eichner was, at relevant times, the President of The Manhattan Club Timeshare Association.

2

8.     Respondent T. Park is a limited liability company organized under the laws of the State of New York with its principal office at 870 7th Avenue, New York, New York 10019, which is the same physical address as 200 West 56th Street, New York, New York 10019.  Respondent T. Park is one of the two named sponsors (or offerors) of the offering of timeshare interests at The Manhattan Club.  Respondent Park Central is the managing member of Respondent T. Park.

9.     Respondent O. Park is a limited liability company organized under the laws of the State of New York with its principal office at 870 7th Avenue, New York, New York 10019.  Respondent O. Park is the second named sponsor of the offering of timeshare interests at The Manhattan Club (together with T. Park, the "Sponsors").  Respondent Park Central is the managing member of Respondent O. Park.

10.    Respondent Park Central is a limited liability company organized under the laws of the State of New York with its principal office at 870 7th Avenue, New York, New York 10019.  Respondent Park Central, as the managing member of Respondents T. Park and O. Park, made or took part in the offering of timeshare interests at The Manhattan Club and is an undisclosed principal.

11.    Respondent Urban is a limited liability company organized under the laws of the State of New York with its principal office at 200 West 56th Street, New York, New York 10019.  Respondent Hospitality Advisors LLC is a non-voting member of Urban.

12.    Respondent Hospitality Advisors is a limited liability company organized under the laws of the State of New York with its principal office at 3 Little Kings Lane, Rye Brook, New York 10573.  Respondent Scott Lager is the manager of Respondent Hospitality Advisors.

3

13.     Respondent Manhattan Club Marketing is a limited liability company organized under the laws of the State of New York with its principal place of business located at 200 West 56th Street, New York, New York 10019.  Respondent Manhattan Club Marketing is the selling agent for the offering of timeshare interests at The Manhattan Club.  Respondent Ian Bruce Eichner is the managing member of Respondent Manhattan Club Marketing.  Respondents Leslie Eichner and Stuart Eichner also are members of Manhattan Club Marketing.

**II.     Respondents' Martin Act Obligations**

14.     The Martin Act protects the public from fraudulent practices in the public offer and sale of securities.  GBL § 352 *et seq.*

15.     The Martin Act requires that before a sponsor (or developer) of a timeshare may offer or sell units, the sponsor must submit an offering plan to OAG.  GBL § 352-e(2).

16.     Sponsors of real estate securities are allowed to make sales based only on the information, statements, literature, or representations in the offering plan.  GBL § 352-e(5).  All prospective purchasers must be furnished with true copies of the offering plan that have been accepted by the OAG.  *Id.*

17.     The sponsor and its principals are required to certify the truthfulness of the representations made in the offering plan.  13 NYCRR § 24.4(b).  A "principal" is defined as (i) all officers, directors, and shareholders of a corporate sponsor that are actively involved in the planning or consummation of the offering or who have decision-making authority to act; and (ii) all other individuals who both own an interest in or control the sponsor, and actively participate in the planning or consummation of the offering.  13 NYCRR § 24.1(c)(2).

18.     Under the Martin Act, an offering plan must provide an adequate factual basis pursuant to which potential purchasers may make a judgment of whether to invest, and "shall not omit any material fact or contain any untrue statement of fact." GBL § 352-e(1)(b).

19.     Both the Martin Act and its corresponding regulations also require that certain information be disclosed to potential purchasers in the offering plan. A sponsor must disclose in the offering plan, among other things:

     a.     the interests and profits that will be paid to the sponsors, the principals, and their officers, directors and others in the promotion and management of the venture. GBL § 352-e(1)(b);

     b.     ". . . that the timeshares should be purchased for personal recreational use and not for profit or investment. . . . [T]hat no resale market exists for timeshares and that the resale value of timeshares, if any, is uncertain." 13 NYCRR § 24.3(d)(6);

     c.     a current or projected budget for the timeshare operations. 13 NYCRR § 24.3(j);

     d.     the purchase price for each type of timeshare interest being offered. 13 NYCRR 24.3(i).

20.     The Martin Act's prohibitions against fraud apply to any person, partnership, corporation, trust or association, or any agent or employee thereof who makes or takes part in a public offering of real estate securities in or from New York State. GBL § 352-e(1)(a).

21.     It is considered a fraudulent practice to violate any provision of GBL § 352-e or 13 NYCRR Part 24. GBL § 352-1.

22.     The OAG is authorized to bring an action to enjoin any person or entity concerned in or in any way participating in such fraudulent practices "from selling or offering for sale to the public within [New York State], as principal, broker or agent, or otherwise, any securities issued or to be issued." GBL § 353(1). The OAG may also seek ". . . restitution of any moneys or property obtained directly or indirectly by any such fraudulent practice." GBL § 353(3)

23.     The OAG is, among other things, empowered to issue subpoenas for documents, information and testimony, to initiate special proceedings where Martin Act violations are found, and to seek injunctive relief and restitution. GBL §§ 352(1) and (2), 352-i, 353, and 354.

### III.     The Manhattan Club Operation

24.     On June 20, 1996, the OAG accepted the initial offering plan for The Manhattan Club, which was submitted by Respondent T. Park.

25.     The Seventh Restated Timeshare Offering Plan and its subsequent amendments was accepted by OAG on August 6, 2008 (the "2008 Plan"), and the Eighth Restated Timeshare Offering Plan and its subsequent amendments was accepted by OAG on May 24, 2012 (the "2012 Plan" and with the 2008 Plan, the "Offering Plans"). The Offering Plans were submitted to OAG by Respondents T. Park and O. Park (collectively, "Sponsors").

26.     As it is currently constituted, The Manhattan Club is comprised of 286 fully-furnished "Timeshare Units" and its operations are governed by a "Timeshare Association" through its board of directors (the "Timeshare Association Board").

27.     The Manhattan Club sells "fixed" and "flexible" timeshare interests to the general public.

6

28.     A "fixed" timeshare interest in The Manhattan Club is an interest that gives the owner the right to stay at the club for a certain number of days during a specific week every year, every other year, every third year or every fourth year.

29.     A "flexible" timeshare interest in The Manhattan Club is an interest that gives the owner the right to make a reservation at The Manhattan Club for a certain number of days each year, every other year, every third year or every fourth year.

30.     In addition to selling timeshare interests, The Manhattan Club also established a "Transient Rental Program." Pursuant to the Transient Rental Program, The Manhattan Club would rent rooms at the club to the general public.

31.     Beginning in 1996, the Timeshare Association contracted with Respondent Urban for management services under a Management Agreement. The Management Agreement has been amended several times since its initial execution and the current Management Agreement was approved by the Timeshare Association on January 18, 2012.

32.     Pursuant to the Management Agreement, Urban is responsible for managing all aspects of The Manhattan Club, including its reservation system. In exchange, Urban is reimbursed for virtually all its expenses and in the relevant time period has received fees equal to between 13.8% and 18.1% of the Timeshare Association's annual revenues.

33.     Respondent Urban, the named Sponsors here, Respondents T. Park and O. Park, and their principals, as a result of their status as principals, made or took part in the offer and sale of the timeshare interests.

34.     Respondent Park Central, as the managing member of Respondents T. Park and O. Park made or took part in the offer and sale of the timeshare interests and is an undisclosed principal.

35.    The Management Agreement vests in Respondent Urban all powers and duties in connection with the operation of The Manhattan Club.

36.    Respondent Urban exercised control over the reservation process, the rental of rooms at The Manhattan Club to the general public, and the operations of The Manhattan Club.

37.    The management of The Manhattan Club by Respondent Urban is integral to the offering of timeshare interests because what a purchaser bought when they bought an interest was the ability to try to reserve, use and occupy a room at The Manhattan Club.

38.    Manhattan Club Marketing is the named sales agent in the Offering Plans and took part in the offer and sale of timeshare interests.

IV.    **Martin Act and Executive Law § 63(12) Violations**

A.    **Sponsors' Sales Staff Failed to Provide The Offering Plans to Purchasers**

39.    Certain sales staff employed by Sponsors sold timeshare interests without providing a copy of the Offering Plans to certain prospective purchasers during the period from 2011 through 2014.

40.    The Eichner Respondents were principals of the Sponsors during the time period that sales were made by certain sales staff employed by Sponsors without providing a copy of the Offering Plans.  Respondent Lager was a principal of Respondent Urban via his substantial role in Respondent Hospitality Advisors during this period.

41.    These sales violated the Martin Act and constituted repeated illegal acts in violation of Executive Law § 63(12).

8

**B.     Sponsors' Sales Staff Made Misrepresentations to Purchasers**

42.     The Offering Plans provide, among other things, that a purchaser shall have 7 business days to cancel a contract to purchase a timeshare interest, that a timeshare interest was not to be considered an investment, and that there was no guarantee that a purchaser could resell a timeshare interest to the Sponsors.

43.     During the period from 2011 through 2014, certain members of the sales staff employed by Sponsors made numerous oral representations to certain prospective purchasers in connection with the offering for sale of timeshare interests that were contrary to the terms of the Offering Plans, including but not limited to, misrepresentations concerning (i) the existence of a cancellation period, (ii) the fact that the purchase of the timeshare interest was not to be viewed as an investment in real estate, and (iii) the Sponsors' willingness to buy back the timeshare interest at the price paid by the purchaser.

44.     The Eichner Respondents were principals of the Sponsors during the time period that certain members of the sales staff employed by Sponsors made these misrepresentations.  Respondent Lager was a principal of Respondent Urban via his substantial role in Respondent Hospitality Advisors during this period.

45.     These oral representations that are contrary to the terms of the Offering Plans violate the Martin Act and constitute repeated illegal acts in violation of Executive Law § 63(12).

**C.     Sponsors' Reservations Agents Failed to Abide By the Offering Plans**

46.     Pursuant to the Offering Plans, reservations by owners for room nights at The Manhattan Club were, subject to certain restrictions, to be taken on a "first come first served basis."

47.     Contrary to the representations contained in the Offering Plans, reservations by owners for room nights at The Manhattan Club were not always taken on a first come first served basis during the period from 2011 through 2014.  Among other things, The Manhattan Club gave preferential treatment to certain owners with respect to reservations through, at times, a new owner hotline, among other things.

48.     The Eichner Respondents were principals of the Sponsors during the time period that there was a failure to abide by the Offering Plans' reservation policies and were aware of the content of the Offering Plans.  Respondent Lager was a principal of Respondent Urban via his substantial role in Respondent Hospitality Advisors during this period.

49.     The failure to abide by the Offering Plans' reservations policies violated the Martin Act and constituted repeated illegal acts in violation of Executive Law § 63(12).

**D.     Certain Aspects of the Implementation of the Transient Rental Program Were Improper**

50.     The Manhattan Club rented rooms to the general public pursuant to the "Transient Rental Program."  Pursuant to the Offering Plans, rooms that were unreserved by owners were rented to the general public in connection with the Transient Rental Program.

51.     During the period from 2011 through 2014, the Timeshare Association at times implemented certain aspects of the Transient Rental Program in an improper manner.

52.     The Eichner Respondents were principals of the Sponsors during the time period that these rentals occurred.  Respondent Lager was a principal of Respondent Urban via his substantial role in Respondent Hospitality Advisors during this period.

53.     Certain aspects of the implementation of the Transient Rental Program were improper in violation of Executive Law § 63(12).

**E.     The Offering Plan Budgets Underestimated Bad Debt Expenses**

54.     Pursuant to 13 NYCRR § 24.3, Sponsors are required to provide a budget in the Offering Plan. The budget must not be misleading, must be prepared in good faith and the assumptions contained therein must be reasonable based on the relevant circumstances and information then available. GBL § 352 *et seq.*

55.     During the period from 2011 through 2014, certain employees of the Timeshare Association prepared budget estimates for forthcoming years, which were reviewed and adopted by the Timeshare Association Board and the financials were audited annually by a third-party accounting firm, copies of which audit were provided in the Offering Plan. The budget, which reflected estimates, provided reserves for bad debt as follows:

a.      In 2011, the reserve for bad debts was $600,000, and the actual bad debt expense later disclosed in the Offering Plan was $2,094,597;

b.      In 2012, the reserve for bad debts was $900,000, and the actual bad debt expense later disclosed in the Offering Plan was $3,959,346;

c.      In 2013, the reserve for bad debts was $1,000,000, and the actual bad debt expense later disclosed in the Offering Plan was $5,174,102;

d.      In 2014, the reserve for bad debts was $1,000,000, and the actual bad debt expense later disclosed in the Offering Plan was $5,277,014.

56.     The Eichner Respondents were principals of the Sponsors during the time period that these budgets were contained in the Offering Plans. Respondent Lager was a principal of Respondent Urban via his substantial role in Respondent Hospitality Advisors during this period.

57.     The foregoing is a violation of the Martin Act.

11

## PROSPECTIVE RELIEF

IT IS HEREBY UNDERSTOOD AND AGREED, by and between the parties that:

58.     The Respondents admit the OAG's findings in paragraphs 1-57 above.

59.     The OAG is willing to accept the terms of this Assurance pursuant to Executive Law § 63(15) and to discontinue its investigation.

60.     The parties each believe that the obligations imposed by this Assurance are prudent and appropriate.

61.     Respondents and their agents and employees, including The Manhattan Club Timeshare Association, Inc., shall not engage in any act directly or indirectly relating to the offer, purchase, sale, issuance, advertisement, marketing, promotion, distribution, negotiation, exchange or transfer of any timeshare interest; provided, however, that Respondents shall have the right to directly complete the sale of ownership interests in The Manhattan Club, and to provide financing for the purchase of such ownership interests, to the approximately fifteen purchasers of timeshare ownership interests who executed contracts to purchase such interests in May, June and July 2014, and who are offered the option to rescind their contracts for a period of 30 days from receiving notice of the rescission option, but do not elect to so rescind and wish to close. Notwithstanding the foregoing, Sponsors may transfer their current ownership interests in The Manhattan Club solely as provided for herein.

62.     Respondents shall enter into an agreement with the third-party operator of timeshare properties ("TMC Purchaser") previously identified to the OAG on or about July 28, 2017, or to such other third party purchaser approved by the OAG to own and sell timeshare interests in New York, whereby (i) T. Park and O. Park shall enter into an agreement with a third-party to transfer timeshare interests from existing owners to TMC Purchaser, all their

timeshare interests in The Manhattan Club, and (ii) after three years of management, Urban will

transfer to TMC Purchaser or its assignee the Management Agreement (the "TMC transfer").

       63.    All Sponsor-appointed current officers and directors will resign from their

positions as members of the Board of the Timeshare Association at the time of the first transfer

of interests to TMC Purchaser, and TMC Purchaser will appoint replacement officers and

directors.

       64.    In the unlikely event of a default on the agreement by TMC Purchaser, and

if TMC Purchaser fails to cure after any required notice is given and any applicable cure period

has expired (a "Default"), and if at the time of the Default Sponsors then continue to own any

timeshare interests (the "Remaining Interests"), then the following provisions shall apply:

a)    Sponsors shall notify OAG of the Default;

b)    Sponsors shall seek to sell their Remaining Interests to a third party entity unaffiliated with any Respondent and to no other person, consumer, or entity;

c)    Sponsors shall advise OAG of the identity of the proposed transferee;

d)    Sponsors shall be free to appoint board members to the Timeshare Association Board to replace any members appointed by TMC Purchaser who resign as a result of the Default; the Sponsor appointed board members shall recuse themselves from any and all votes involving in any way any of the Respondents or affiliated entities;

e)    Sponsors shall propose an independent monitor ("Monitor") to ensure that the Manhattan Club is operated in accordance with the offering plan then on file with the OAG and that Sponsor does not sell any timeshare interests except as provided in paragraph 62 above; OAG shall have the right to approve any Monitor proposed by Sponsors before such Monitor shall be appointed. If approval is not given for a proposed Monitor, Sponsors shall propose a different Monitor until such time as OAG approves of the proposed Monitor;

f)    The Monitor shall have full and complete access to all books, records, information and personnel of all Respondents to ensure full compliance with the terms of this Assurance;

g)    If the Management Agreement reverts back to Urban or any entity affiliated with any of the Respondents as a result of the Default or

13

for any reason, the Respondents agree that the Management Fee will be limited to 15% of expenses actually paid, not including the Management Fee.

### RESTITUTION

65.    Respondents shall pay the OAG by wire transfer a total of six million five hundred thousand dollars and zero cents ($6,500,000.00) as restitution for and in settlement of the forgoing, as follows:

a.    Within fifteen (15) days of the release of funds frozen pursuant to Supreme Court's orders dated July 24, 2014 and May 26, 2016, Respondents shall pay three million two hundred fifty thousand dollars and zero cents ($3,250,000.00);

b.    On or before the one-year anniversary of the execution of this Assurance of Discontinuance, Respondents shall pay one million six hundred twenty five thousand dollars and zero cents ($1,625,000.00); and

c.    On or before the two-year anniversary of the execution of this Assurance of Discontinuance,  Respondents shall pay one million six hundred twenty five thousand dollars and zero cents ($1,625,000.00);

66.    Any payments and all correspondence related to the Assurance must reference Assurance 17-149.

67.    The payment that Respondents must tender to the OAG pursuant to paragraph A above shall be sent by wire transfer to the following account:

a)    Bank Name:          Key Bank N.A., Empire State Plaza Branch, Albany, NY
       Bank Routing No:    ███████
       Account Title:      "Attorney General Account"
       Account No.:        ███████

14

68.     The OAG shall retain a claims administrator ("Claims Administrator"), with expenses paid from the restitution funds, to disburse the restitution amounts to certain Manhattan Club timeshare owners as detailed below. Respondents and TMC Purchaser shall not be entitled to any distributions from the restitution amounts and the claims administrator will ensure that no payments are made to Respondents, TMC Purchaser, or any entities owned by or affiliated in any way with Respondents or TMC Purchaser, whether they are timeshare owners or not.

69.     The disbursements shall be made as follows:

a.      The first payment ($3,250,000.00) shall be divided between timeshare owners at The Manhattan Club who were eligible to make a reservation in calendar years 2011 through 2014, inclusive and

i.    were current on their obligations to The Manhattan Club at the time they were eligible to make a reservation and

ii.   did not use all of their allotted nights (collectively, those who satisfy all of the above requirements are referred to as the "First Compensation Group").

To calculate each owner's share of the disbursement, the Claims Administrator shall calculate the number of unused nights for each such owner in 2011 through 2014, inclusive, and divide that by the total number of unused nights for all owners in the First Compensation Group. The Claims Administrator shall then multiply that number by the amount of the first payment, $3,250,000.00, with the maximum amount any owner shall be entitled to receive not to exceed $250.00 per unused night.

If the entire $3,250,000.00 is not completely distributed to the First Compensation Group as a result of the limitation of $250.00 per unused night, then all remaining amounts shall be added to the amounts to be distributed pursuant to subsection b below.

        b.      The second payment ($1,625,000.00, plus amounts remaining from paragraph a above, if any), shall be divided among those owners as of the date of this Assurance who remain owners at the time of the second payment. Each owner shall be entitled to receive a share of the second payment in the same proportion as such owner's annual maintenance fees in such calendar year are to the total maintenance fees charged to all owners in that calendar year.

        c.      The third payment ($1,625,000.00) shall be divided among those owners as of the date of this Assurance who remain owners at the time of the third payment. Each owner shall be entitled to receive a share of the third payment in the same proportion as such owner's annual maintenance fees in such calendar year are to the total maintenance fees charged to all owners in that calendar year.

## MISCELLANEOUS

70.      OAG has agreed to the terms of this Assurance based on, among other things, the representations made to OAG by the Respondents and their counsel and OAG's own factual investigation as set forth in paragraphs 1-57 above. To the extent that any material representations are later found to be inaccurate or misleading, this Assurance is voidable by the OAG in its sole discretion.

71.      If the Assurance is voided or breached, the Respondents agree that any statute of limitations or other time-related defenses applicable to the subject of the Assurance and any claims arising from or relating thereto are tolled from and after the date of this Assurance.

16

72.     In the event the Assurance is voided or breached, the Respondents expressly agree and acknowledge that this Assurance shall in no way bar or otherwise preclude OAG from commencing, conducting or prosecuting any investigation, action or proceeding, however denominated, related to the Assurance, against the Respondents, or from using in any way any statements, documents or other materials produced or provided by the Respondents prior to or after the date of this Assurance.

73.     No representation, inducement, promise, understanding, condition, or warranty not set forth in this Assurance has been made to or relied on by the Respondents in agreeing to this Assurance.

74.     The Respondents represent and warrant, through the signatures below, that the terms and conditions of this Assurance are duly approved, and execution of this Assurance is duly authorized.  The Respondents shall not take any action or make any statement denying, directly or indirectly, the propriety of this Assurance or expressing the view that this Assurance is without factual basis.  Nothing in this paragraph affects the Respondents' (i) testimonial obligations or (ii) right to take legal or factual positions contrary to the terms of this document in defense of litigation or other legal proceedings, to which OAG is not a party.  This Assurance may not be used by any third party in any other proceeding and is not intended, and shall not be construed, as an admission of liability by the Respondents in any other proceeding.

75.     This Assurance may not be amended except by an instrument in writing signed on behalf of all the parties to this Assurance.

76.     This Assurance shall be binding on and inure to the benefit of the parties to this Assurance and their respective successors and assigns and the covenants contained herein shall run with the land, provided that no party, other than OAG, may assign, delegate, or

17

otherwise transfer any of its rights or obligations under this Assurance without the prior written consent of OAG.

77.     Respondents agree that this Assurance may be recorded with the NYC Registrar against the timeshare interests as this Assurance affects the property and all subsequent purchasers should be placed on notice of the requirements of this Assurance.

78.     In the event that any one or more of the provisions contained in this Assurance shall for any reason be held to be invalid, illegal, or unenforceable in any respect, in the sole discretion of the OAG such invalidity, illegality, or unenforceability shall not affect any other provision of this Assurance.

79.     Any failure by the OAG to insist on the strict performance by Respondents of any of the provisions of this Assurance shall not be deemed a waiver of any of the provisions hereof, and the OAG, notwithstanding that failure, shall have the right thereafter to insist on the strict performance of any and all of the provisions of this Assurance to be performed by the Respondents.

80.     To the extent not already provided under this Assurance, the Respondents shall, upon request by OAG, provide all documentation and information necessary for OAG to verify compliance with this Assurance and to effectuate the terms of this Assurance.

81.     All notices, reports, requests, and other communications to any party pursuant to this Assurance shall be in writing and shall be directed as follows:

If to the Respondents, to:

Mylan L. Denerstein
Gibson, Dunn & Crutcher LLP
200 Park Avenue, 47th Floor
New York, NY 10166; and

18

Jeffrey Rotenberg
DLA Piper LLP
1251 Avenue of the Americas
New York, NY 10020-1104.

If to the OAG, to:

Office of the Attorney General
Attention: Bureau Chief, Real Estate Finance Bureau
120 Broadway New York, New York 10271.

82.     Acceptance of this Assurance by OAG shall not be deemed approval by OAG of any of the practices or procedures referenced herein, and the Respondents shall make no representation to the contrary.

83.     Pursuant to Executive Law § 63(15), evidence of a violation of this Assurance shall constitute prima facie proof of violation of the applicable law in any action or proceeding thereafter commenced by OAG.

84.     This Assurance shall be governed by the laws of the State of New York without regard to any conflict of laws principles.

85.     The Assurance and all its terms shall be construed as if mutually drafted with no presumption of any type against any party that may be found to have been the drafter.

86.     If a court of competent jurisdiction determines that any of the Respondents have breached this Assurance, the Respondents shall pay to OAG the cost, if any, of such determination and of enforcing this Assurance, including without limitation legal fees, expenses, and court costs.

87.     The OAG finds the relief and agreements contained in this Assurance appropriate and in the public interest.  The OAG is willing to accept this Assurance pursuant to Executive Law § 63(15), in lieu of commencing a statutory proceeding.

19

88. Nothing contained herein shall be construed as to deprive any person of any private right under the law.

89. This Assurance may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

IN WITNESS WHEREOF, this Assurance is executed by the parties hereto on August
14, 2017.


ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By: _____
      Louis M. Solomon
      Assistant Attorney General
      120 Broadway
      New York, NY 10271
      Phone: 212. 416.6047
      Fax: 212. 416.6595


O. PARK CENTRAL LLC

By: _____

Counsel for O. Park Central LLC

By: _____
      Mylan L. Denerstein
      Gibson, Dunn & Crutcher LLP
      200 Park Avenue
      New York, NY 10166

MANHATTAN CLUB MARKETING
GROUP LLC

By: _____

Counsel for Manhattan Club Marketing Group
LLC

By: _____
      Mylan L. Denerstein
      Gibson, Dunn & Crutcher LLP
      200 Park Avenue
      New York, NY 10166


T. PARK CENTRAL LLC

By: _____

Counsel for T. Park Central LLC

By: _____
      Mylan L. Denerstein
      Gibson, Dunn & Crutcher LLP
      200 Park Avenue
      New York, NY 10166

PARK CENTRAL MANAGEMENT LLC

By: _____

Counsel for Park Central Management LLC

By: _____
      Mylan L. Denerstein
      Gibson, Dunn & Crutcher LLP
      200 Park Avenue
      New York, NY 10166

NEW YORK URBAN OWNERSHIP
MANAGEMENT LLC

By: _____

Counsel for New York Urban Ownership
Management LLC

By: _____
      Mylan L. Denerstein
      Gibson, Dunn & Crutcher LLP
      200 Park Avenue
      New York, NY 10166


21

IAN BRUCE EICHNER

Counsel for Ian Bruce Eichner

By: _____
Mylan L. Denerstein
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166


STUART P. EICHNER

_____

Counsel for Stuart P. Eichner

By: _____
Mylan L. Denerstein
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166


LESLIE H. EICHNER

_____

Counsel for Leslie H. Eichner

By: _____
Mylan L. Denerstein
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166


SCOTT L. LAGER

_____

Counsel for Scott L. Lager

By: _____
Jeffrey D. Rotenberg
DLA Piper LLP
1251 Avenue of the Americas
New York, NY 10020

22

IN WITNESS WHEREOF, this Assurance is executed by the parties hereto on August $\underline{9}$, 2017.

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By: _____
            Louis M. Solomon
            Assistant Attorney General
            120 Broadway
            New York, NY 10271
            Phone: 212. 416.6047
            Fax: 212. 416.6595

T. PARK CENTRAL LLC

By: _____

Counsel for T. Park Central LLC

By: _____
            Mylan L. Denerstein
            Gibson, Dunn & Crutcher LLP
            200 Park Avenue
            New York, NY 10166

O. PARK CENTRAL LLC

By: _____

Counsel for O. Park Central LLC

By: _____
            Mylan L. Denerstein
            Gibson, Dunn & Crutcher LLP
            200 Park Avenue
            New York, NY 10166

PARK CENTRAL MANAGEMENT LLC

By: _____

Counsel for Park Central Management LLC

By: _____
            Mylan L. Denerstein
            Gibson, Dunn & Crutcher LLP
            200 Park Avenue
            New York, NY 10166

MANHATTAN CLUB MARKETING
GROUP LLC

By: _____

Counsel for Manhattan Club Marketing Group
LLC

By: _____
            Mylan L. Denerstein
            Gibson, Dunn & Crutcher LLP
            200 Park Avenue
            New York, NY 10166

NEW YORK URBAN OWNERSHIP
MANAGEMENT LLC

By: _____

Counsel for New York Urban Ownership
Management LLC

By: _____
            Mylan L. Denerstein
            Gibson, Dunn & Crutcher LLP
            200 Park Avenue
            New York. NY 10166

21

IAN BRUCE EICHNER                          LESLIE H. EICHNER

_____                    _____

Counsel for Ian Bruce Eichner             Counsel for Leslie H. Eichner

By: _____               By: _____
Mylan L. Denerstein                        Mylan L. Denerstein
Gibson, Dunn & Crutcher LLP                Gibson, Dunn & Crutcher LLP
200 Park Avenue                            200 Park Avenue
New York, NY  10166                        New York, NY  10166

STUART P. EICHNER                          SCOTT L. LAGER

_____                    _____

Counsel for Stuart P. Eichner             Counsel for Scott L. Lager

By: _____               By: _____
Mylan L. Denerstein                        Jeffrey D. Rotenberg
Gibson, Dunn & Crutcher LLP                DLA Piper LLP
200 Park Avenue                            1251 Avenue of the Americas
New York, NY  10166                        New York, NY  10020

22

IAN BRUCE EICHNER

_____

Counsel for Ian Bruce Eichner

By: _____
Mylan L. Denerstein
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

STUART P. EICHNER

_____

Counsel for Stuart P. Eichner

By: _____
Mylan L. Denerstein
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

LESLIE H. EICHNER

_____

Counsel for Leslie H. Eichner

By: _____
Mylan L. Denerstein
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

SCOTT L. LAGER

_____

Counsel for Scott L. Lager

By: _____
Jeffrey D. Rotenberg
DLA Piper LLP
1251 Avenue of the Americas
New York, NY 10020

IAN BRUCE EICHNER

_____

Counsel for Ian Bruce Eichner

By: _____
Mylan L. Denerstein
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166

STUART P. EICHNER

_____

Counsel for Stuart P. Eichner

By: _____
Mylan L. Denerstein
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166

LESLIE H. EICHNER

_____

Counsel for Leslie H. Eichner

By: _____
Mylan L. Denerstein
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166

SCOTT L. LAGER

_____

Counsel for Scott L. Lager

By: _____
Jeffrey D. Rotenberg
DLA Piper LLP
1251 Avenue of the Americas
New York, NY  10020

IAN BRUCE EICHNER

_____

Counsel for Ian Bruce Eichner

By: _____
Mylan L. Denerstein
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

STUART P. EICHNER

_____

Counsel for Stuart P. Eichner

By: _____
Mylan L. Denerstein
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

LESLIE H. EICHNER

_____

Counsel for Leslie H. Eichner

By: _____
Mylan L. Denerstein
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

SCOTT L. LAGER

_____

Counsel for Scott L. Lager

By: _____
Jeffrey D. Rotenberg
DLA Piper LLP
1251 Avenue of the Americas
New York, NY 10020