```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/27/21
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CHARLES R. ACKLIN, ET AL.,                                       :
                                                                 :
                                            Plaintiff,           :
                                                                 :      1:20-cv-7042-GHW
                                                                 :
                    -against-                                    :
                                                                 :      MEMORANDUM OPINION &
IAN BRUCE EICHNER, LESLIE H.                                     :              ORDER
EICHNER STUART P. EICHNER, SCOTT L.                              :
LAGER, T. PARK CENTRAL LLC, O. PARK                              :
CENTRAL LLC, PARK CENTRAL                                        :
MANAGEMENT, LLC, MANHATTAN CLUB                                  X
MARKETING GROUP, LLC, NEW YORK
URBAN OWNERSHIP MANAGEMENT, LLC
AND BLUEGREEN VACATIONS
UNLIMITED, INC.,

                                            Defendant.
-----------------------------------------------------------------

GREGORY H. WOODS, United States District Judge:

      Plaintiffs Charles R. Acklin, et al.[1] bring this action against Defendants Ian Bruce Eichner, Leslie H. Eichner, Stuart P. Eichner, Scott L. Lager, T. Park Central, LLC ("T. Park"), O. Park Central, LLC ("O. Park"), Park Central Management, LLC, Manhattan Club Marketing Group, LLC, New York Urban Ownership Management (together, the "Eichner Defendants"), and Bluegreen Vacations Unlimited, Inc. ("Bluegreen"), alleging fraud, breach of contract, tortious interference, violations of New York General Business Law ("GBL") § 349, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

      Plaintiffs' claims arise out of two allegedly fraudulent schemes perpetrated by Defendants. First, Plaintiffs claim that the Eichner Defendants fraudulently induced Plaintiffs to purchase interests in a timeshare known as The Manhattan Club ("TMC") between 1996 and 2013 through a

---

[1] Acklin is the first of 208 named plaintiffs in this action.

series of oral misrepresentations (the "Purchase Scheme"). Second, Plaintiffs claim that the Eichner Defendants deliberately rendered Plaintiffs' TMC interests worthless—enabling the Eichner Defendants to reacquire the TMC interest at a fraction of the purchase price—by making reservations difficult to obtain and charging high maintenance fees amounting to several thousands of dollars, forcing many Plaintiffs into arrears (the "Buy Back Scheme"). BlueGreen purportedly continued the Buy Back Scheme after agreeing to acquire control of TMC from the Eichner Defendants in 2018.

On October 22, 2021 Bluegreen filed a motion to dismiss Plaintiffs' Amended Complaint. Dkt. No. 71. Plaintiffs filed an opposition on November 13, 2020. Dkt. No. 86. And Bluegreen filed its reply on November 19, 2020. Dkt. No. 87. Subsequently, the Eichner Defendants moved to dismiss the Amended Complaint on November 25, 2020. Dkt. No. 88. Plaintiffs filed an opposition on December 30, 2020, and a reformatted opposition on January 13, 2021. Dkt. Nos. 94, 96. The Eichner Defendants filed their reply on January 13, 2021. Dkt. No 95.

For the reasons stated below, Defendants' motions are GRANTED without prejudice as to Plaintiffs' RICO claim. Having dismissed the only claim creating federal jurisdiction over this action, this Court declines to exercise supplemental jurisdiction over the remaining state law claims. Accordingly, those claims are dismissed, also without prejudice.

**I.      BACKGROUND**

Unless otherwise noted, the following facts are derived from the Plaintiffs' Amended Complaint, (Am. Compl. ("AC"), Dkt. No. 17), and the documents incorporated therein.[2] These

---

[2] Plaintiffs attach to the Amended Complaint an Assurance of Discontinuance ("AOD"), Dkt. No. 16-1, and the Second Farooq Affirmation, Dkt. No. 16-2. While courts limit their review to the allegations in the complaint when deciding a motion to dismiss, "in certain circumstances . . . [extrinsic] documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). As the AOD and the Farooq Affirmation are attached to the Amended Complaint, they may be considered here.

facts are accepted as true for purposes of this motion.  *See, Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

### A. Facts

#### 1. The Purchase Scheme

Between 1996 and 2013, the Eichner Defendants sold Plaintiffs timeshares in TMC. AC ¶¶ 1–127.  To induce Plaintiffs to purchase TMC timeshares, the Eichner Defendants made three oral representations (the "Oral Promises") prior to purchase.  First, the Eichner Defendants asserted that each Plaintiff would be able to make same-day or short notice reservations to access their TMC timeshares "easily."  AC ¶ 218.  Second, the Eichner Defendants represented that the annual maintenance fees charged to Plaintiffs would (i) remain reasonable and stay low; (ii) would increase no more than the cost of living; and (iii) would likely decrease over time as more people purchased TMC timeshare interests.  AC ¶ 234.  Finally, the Eichner Defendants represented to each Plaintiff that (i) the TMC interests would increase in value over time; (ii) Plaintiffs could sell their timeshare interests to the general public; and (iii) if unable to sell their timeshare to the general public, the Eichner Defendants would buy back Plaintiffs' timeshare interests for the initial purchase price.  AC ¶ 247.  Only after purchasing their TMC interests did Plaintiffs receive TMC's Offering Plan and Bylaws Documents.  AC ¶ 176.  These documents included provisions explicitly contradicting or disclaiming the Oral Promises.  *Id.*

In addition to the Oral Promises, the Eichner Defendants omitted several facts while selling Plaintiffs the TMC interests.  First, the Eichner Defendants failed to inform Plaintiffs that the maintenance fees were set at a subsidized rate, and once that subsidy was withdrawn, the initial maintenance fees paid by Plaintiffs (amounting to several hundred dollars) would rise faster than the cost of living (ultimately to several thousand dollars).  AC ¶¶ 156, 169.  Second, the Eichner Defendants failed to inform Plaintiffs that Plaintiffs would "have to make . . . reservations many

3

months . . . in advance." AC ¶ 160. Finally, the Eichner Defendants omitted that they would allow members of the general public to reserve and occupy TMC timeshares like hotel rooms. AC ¶ 161. And that the Eichner Defendants would assure availability of TMC timeshares for members of the general public, while deliberately withholding availability of TMC timeshares from Plaintiffs. AC ¶¶ 162, 175. The Offering Plan and Bylaws documents sent to Plaintiffs after purchase, however, explicitly included terms describing the omitted information that the Eichner Defendants withheld while selling the TMC timeshares. AC ¶ 177.

### 2. The Buy Back Scheme

As a result of high maintenance fees and their inability to book reservations, the value of Plaintiffs' interests greatly diminished. AC ¶ 171. Plaintiffs allege that this was a deliberate effort by the Eichner Defendants to drive down the value of the TMC interests, so that the Eichner Defendants could buy back Plaintiffs' TMC interests for pennies on the dollar (the "Buy Back Scheme"). AC ¶ 172. As TMC timeshare purchasers, including Plaintiffs, were ultimately left in arrears from high maintenance fee bills, the Eichner Defendants offered to forgive the arrearages and buy back the TMC interests for $100. AC ¶¶ 171–72. This enabled the Eichner Defendants "to reacquire many units that they had sold for tens of thousands of dollars and on which they had been paid thousands of dollars in annual maintenance fees, for $100." AC ¶ 172. Because Plaintiffs have been unable to sell their interests on the open market due to the high maintenance fees and members' inability to easily book reservations, the Buy Back Scheme is Plaintiffs' only option to dispose of their TMC interests. AC ¶ 170–72.

### 3. The New York Attorney General Investigates

In 2013, the New York State Attorney General (the "NYAG") began investigating the Eichner Defendants' alleged improper practices at TMC, including possible violations of the Martin Act and GBL §§ 352. AC ¶ 188. As a result, the NYAG eventually commenced legal proceedings

4

against the Eichner Defendants pursuant to GBL § 354 (*Schneiderman v. Eichner et al.*, Index No. 451536/2014).  AC ¶ 189.  The investigation uncovered numerous false and deceptive practices by the Eichner Defendants in their management and operation of TMC, as well as in the sale of interests in TMC.  AC ¶ 192.  For example:

> i. Misrepresenting the number of available units at TMC;
> ii. Failing to pay maintenance fees on time and nevertheless earning millions of dollars in rental income on its inventory from nonmembers, while reducing inventory that would otherwise be available to TMC members;
> iii. Requesting payment of maintenance fees in advance of their actual due date;
> iv. Providing preferential reservation treatment to certain TMC members;
> v. Allowing Defendants to reserve rooms while delinquent in paying maintenance fees, violating the Offering Plan; and
> vi. Removing rooms from available inventory for use by paying TMC members so they could instead be used without payment by Defendants as unpaid "show rooms."

AC ¶ 192; Dkt. No. 17-2 ("Farooq Affirmation").

As a result of the NYAG's investigation and the *Schneiderman* proceeding, on August 14, 2017, the Eichner Defendants entered into an Assurance of Discontinuance.  AC ¶ 190; Dkt. No 17-1 (the "AOD").  Pursuant to the AOD, the Eichner Defendants agreed to pay $6.5 million dollars as restitution, sell their TMC interests by 2021, and be barred for life from the timeshare industry.  AC ¶ 194; AOD ¶¶ 61, 63, 65.

### 4. Purchase Agreement with BlueGreen

Under the terms of the AOD, the Eichner Defendants were required to "enter into an agreement with a third-party operator of timeshare properties ('TMC Purchaser') . . . whereby" (i) Defendants T. Park and O. Park (the "Sponsors") would transfer their interests in TMC to the TMC Purchaser; (ii) after three years of management, Defendant Urban would transfer the Management Agreement to the TMC Purchaser; and (iii) following the transfer contemplated in (i),

any officer or director of the Board of the Timeshare Association appointed by the Sponsors would resign, after which the TMC Purchaser would appoint replacements. AOD ¶¶ 62–63. In June 2018 the Eichner Defendants entered into the required agreement with BlueGreen. AC ¶ 142. Under the agreement, BlueGreen became the Eichner Defendants' successor in interest, purchased TMC's inventory and the future right to control the management contract, and assumed control over four of the seven seats on TMC's Board. AC ¶ 142.

Plaintiffs do not allege that BlueGreen had any role in the Purchase Scheme or in the Buy Back Scheme prior to BlueGreen's involvement with TMC. However, after BlueGreen took control of TMC, Plaintiffs continued to experience difficulty selling their TMC interests to the general public and making same-day or short notice reservations. AC ¶¶ 207–08. Plaintiffs also continued to be charged excessive maintenance fees. AC ¶ 209. As a result, Plaintiffs allege that BlueGreen must have continued the practices comprising the Buy Back Scheme. AC ¶ 202.

The Eichner Defendants and BlueGreen have since terminated their purchase agreement and are in arbitration. AC ¶ 206.

## II.     LEGAL STANDARD—MOTION TO DISMISS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs must allege in their complaint facts that, if accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this plausibility standard, Plaintiffs must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged. *Id.* Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8 "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

"[O]n a motion to dismiss[,] a court must accept all factual allegations as true and draw all reasonable inferences in the plaintiffs favor." *Levy v. Southbrook Int'l Investments, Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054 (2002) (citations omitted). However, the Court need not accept legal conclusions as true. *Iqbal*, 556 U.S. at 678. And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

Where, as here, Plaintiffs base several of their claims on fraud, those claims are also subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

### III. DISCUSSION

Defendants' motions each raise a host of issues regarding the adequacy of Plaintiffs claims. Ultimately, however, Plaintiffs fail to adequately plead their RICO claim and the Court declines to exercise supplemental jurisdiction over the remaining state claims.

### A. Plaintiffs Fail to Plead the Existence of a RICO Enterprise

To establish a RICO violation, Plaintiffs must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001)). As discussed below, Plaintiffs fail to plead both the existence of an enterprise and a pattern of racketeering activity.

Plaintiffs claim that TMC is

> [A] RICO enterprise, pursuant to 18 U.S.C. § 1961(4) . . . . Defendants created and managed TMC to defraud Plaintiffs and other purchasers of TMC timeshares and to compel them to pay inflated maintenance fees. The Defendants agreed to utilize TMC to carry out the fraudulent schemes detailed herein. This agreement has been ongoing between the Defendants for at least the last five years and continues to date.

AC ¶¶ 274–76.

For the purposes of the RICO Act, an "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). While the "statute does not specifically define the outer boundaries of the 'enterprise' concept," *Boyle v. United States*, 556 U.S. 938, 944 (2009), in general, "RICO requirements are most easily satisfied when the enterprise is a formal legal entity," *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004). The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. *United States v. Turkette*, 452 U.S. 576, 583 (1981).

While there is little doubt that TMC may be an enterprise for RICO purposes, it is not enough for Plaintiffs to simply name an organization and state in a conclusory fashion that Defendants used the entity to perpetrate a fraud. Plaintiffs must also allege information regarding the hierarchy, organization, activities of the alleged enterprise, and—critically in this case—explain each participant's role in the alleged fraudulent or illegal conduct. *See Beter v. Murdoch*, 2018 WL 3323162, at *6 (S.D.N.Y. June 22, 2018) ("Where a plaintiff fails to provide . . . any solid

8

information regarding the hierarchy, organization, and activities of an alleged association in fact and fails to explain each participant's role in the alleged course of fraudulent or illegal conduct, there is no basis to support the conclusion" that the individuals in question were part of the enterprise.) (citing *First Cap. Asset Mgmt.*, 385 F.3d at 174 (quotation marks omitted)), *aff'd*, 771 F. App'x 62 (2d Cir. 2019).

Here, Plaintiffs describe how each defendant is involved with TMC—i.e., the hierarchy and organization. *See* AC ¶¶ 131–42. And they generally allege the activities of the enterprise—i.e. the alleged frauds and other actions perpetrated by Defendants through TMC. *See* AC ¶¶ 128, 275–84. Plaintiffs do not, however, "explain each participant's role in the alleged course of fraudulent or illegal conduct." *See Beter*, 2018 WL 3323162, at *6. Instead, Plaintiffs lump together each defendant, including at times BlueGreen, for nearly every allegation. *See, generally*, AC. This type of slapdash group pleading is insufficient to plead the existence of an enterprise. *See Lewis*, 2020 WL 7390233, at *4 (S.D.N.Y. Aug. 18, 2020) ("A complaint which simply groups together the individuals and entities involved in an alleged racketeering act and calls them an enterprise is not a RICO enterprise.") (citing *Cedar Swamp*, 487 F. Supp. 2d 444, 450 (S.D.N.Y. 2007).

The only possible exception to Plaintiffs' lumping are the allegations pertaining to BlueGreen. Here, Plaintiffs allege that BlueGreen "in June 2018 assumed the rights and responsibilities of the Eichner Defendants vis-à-vis TMC, became its successor in interest, purchased TMC's inventory and the future right to control the management contract, and presently occupies four of the seven existing seats on TMC's board of directors." AC ¶ 142. But even with allegations related to BlueGreen, Plaintiffs continue to refer only to "Defendants" without distinguishing which defendants took which action. The Amended Complaint makes no allegation

that BlueGreen directed every action at TMC from June 2018 to the present,[3] and as a result it is impossible to discern BlueGreen's specific acts as part of the alleged enterprise.

Accordingly, Plaintiffs RICO claim is dismissed for failing to plead the existence of a RICO enterprise.

### B.   Plaintiffs Fail to Plead a Pattern of Racketeering Activity

Even if Plaintiffs adequately plead a RICO enterprise their RICO claim would still be subject to dismissal for failing to plead a pattern of racketeering activity. "Under any prong of § 1962, a plaintiff in a civil RICO suit must establish a 'pattern of racketeering activity.'" *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 465 (2d Cir. 1995). This means that Plaintiffs "must plead at least two predicate acts, and must show that the predicate acts are related and that they amount to, or pose a threat of, continuing criminal activity." *Id.* (citing 18 U.S.C. § 1961(5) and *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). Additionally, Plaintiffs must adequately plead each element of a substantive RICO claim for each defendant. *See DeFalco*, 244 F.3d at 306. That said, to be liable for a RICO violation, a defendant "need not himself have committed or agreed to commit the two or more predicate acts" constituting the RICO violations, but must have "kn[own] about and agreed to facilitate the scheme." *Salinas v. United States*, 522 U.S. 52, 53 (1997).

"Racketeering activity encompasses, among other things, any act indictable for crimes enumerated under 18 U.S.C. § 1961(1)(B)." *Bigsby v. Barclays Capital Real. Estate, Inc.*, 298 F. Supp. 3d 708, 716-717 (S.D.N.Y. 2018), *aff'd*, 841 F. App'x 331 (2d Cir. 2021). Here, the alleged racketeering activities are acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

To establish racketeering activity based on the predicate acts of violating the mail or wire fraud statutes, Plaintiffs must show "(1) a scheme to defraud [including scienter], (2) money or

---

[3] It is understandable why Plaintiffs chose not to make such an allegation. As Plaintiffs admit, BlueGreen has since terminated its agreement to acquire the Eichner Defendants' interest in TMC. AC ¶ 206.

10

property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quoting *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015)). Allegations of mail and wire fraud are also subject to the heightened pleading requirements of Rule 9(b). *See First Cap. Asset. Mgmt.,* 385 F.3d at 178. Thus, Plaintiffs are required to (1) "adequately specify the statements [they] claim[ ] were false or misleading"; (2) "give particulars as to the respect in which plaintiff[s] contend[] the statements were fraudulent"; (3) "state when and where the statements were made"; and (4) "identify those responsible for the statements." *Lundy v. Catholic Health Sys.*, 711 F.3d 106, 119 (2d Cir. 2013) (quotation marks omitted). Additionally, "'civil RICO has resulted in a flood of what are and should be state court cases that are being reframed and brought in federal court as RICO actions because of the carrot of treble recovery and the availability of a federal forum.' As a result, courts scrutinize RICO claims, particularly those based solely on predicate acts of wire fraud." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Archway Ins. Servs. LLC*, 2012 WL 1142285, at *3 (S.D.N.Y. Mar. 23, 2012) (citations omitted).

Here, Plaintiffs claim that the Eichner Defendants committed mail and wire fraud by sending "fraudulent maintenance statements to TMC members" and by "fraudulently advis[ing] TMC members that reservations could not be made because of supposed unavailability of rooms while allowing third-party, non-members of the general public to reserve such rooms." Eichner Opp'n at 18. According to Plaintiffs, "[e]very mailing of an invoice for a fraudulently assessed annual maintenance fee is a separate actionable predicate RICO act. Likewise, every use of the mail or interstate wires to fraudulently deny members a reservation because of the supposed unavailability of rooms while allowing non-members of the general public to reserve such rooms is a new actionable predicate act." *Id.* Additionally, Plaintiffs claim that the "buy-back" offers sent by Defendants constituted mail and wire fraud. AC ¶ 280. Notably, however, in the Eichner Opposition, Plaintiffs disclaim their allegation in paragraph 278 of the Amended Complaint and no

11

longer rely on any "misstatements and material omissions made to induce Plaintiffs to purchase their timeshare interests" (i.e. the Purchase Scheme), or mailing the Offering Plan and Bylaws, as a basis for their RICO claim. Eichner Opp'n at 19.

As discussed below, none of the remaining allegedly fraudulent statements are pleaded with the requisite particularity to form the basis of a RICO claim.

Regarding the allegedly fraudulent maintenance statements, Plaintiffs have failed to plead with any particularity (1) the dates of the allegedly fraudulent statements; (2) the content of those statements that was false or misleading; or (3) that Plaintiffs, as opposed to other TMC members, received the fraudulent statements. Indeed, the only "fraudulent" aspect of the maintenance statements seems to be that the amount of fees assessed was greater than the amount the Eichner Defendants promised to Plaintiffs when the TMC interests were sold. Because Plaintiffs have disclaimed misstatements related to the Purchase Scheme as predicates for their RICO claim, Plaintiffs' allegations here amount to no more than claim for breach of contract, which is insufficient to allege fraud.[4] *See Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.*, 154 F. Supp. 2d 682, 694 (S.D.N.Y. 2001) (that complainant has not recovered a contractual loss is insufficient to prove threat of criminal acts) (citing *Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir. 1999) ("breach of contract is not fraud, and a series of broken promises therefore is not a pattern of fraud"); *LCS Grp., LLC v. Shire LLC*, 2019 WL 1234848, at *6 (S.D.N.Y. Mar. 8, 2019) ("[A] cause of action sounding in fraud cannot be maintained when the only fraud charged relates to a breach of contract." (quotation marks omitted)).

---

[4] Plaintiffs allege in the Amended Complaint that the annual maintenance fees charged under BlueGreen "have no relation to the Defendants' actual costs to operate TMC." AC ¶ 209. But decline to provide any further detail other than stating that it is more expensive for a TMC member to stay for a week than for a member of the general public. This type of unadorned, "conclusory" allegation is insufficient to state a claim under Rule 12(b)(6). *See Iqbal*, 556 U.S. at 678.

Regarding the allegations that Defendants "fraudulently prevent[ed] Plaintiffs from making same-day or short notice reservations," AC. ¶ 281, Plaintiffs similarly fail to specify (1) when Defendants made the statements constituting the fraud; (2) who made the allegedly fraudulent statements; (3) the content of those statements that was false or misleading; or (4) that Plaintiffs, as opposed to other TMC members, received the fraudulent statements.

In opposition to the Eichner Defendants' motion to dismiss, Plaintiffs aver that the contents of the AOD and the Farooq Affirmation supply the requisite particularity under Rule 9(b). Eichner Opp'n at 21. But this is not so. Regarding reservations, the AOD states only that "[TMC] gave preferential treatment to certain owners with respect to reservations through, at times, a new owner hotline," and that "the Timeshare Association at times implemented certain aspect of the Transient Rental Program in an improper manner." AOD ¶¶ 47, 51. Likewise, the Farooq Affirmation describes only that rooms were rented to the general public more than 48 hours in advance, which violated the terms of the Offering Plan. Farooq Affirmation ¶¶ 14–20. That the AOD and the Farooq Affirmation posit generally that certain aspects of TMC's reservation system were improper is not sufficient for Plaintiffs in this action to plead that Defendants committed fraud.[5]

This leaves Plaintiffs with only the Buy Back Scheme as a predicate for their RICO claim. But Plaintiffs' allegations related to the Buy Back Scheme amount only to vague accusations that the Eichner Defendants and BlueGreen offered to purchase TMC members' interests for $100. AC ¶¶ 171–72, 202, 215, 239, 248, 281. Plaintiffs fail to identify who made these offers and to whom these offers were made. Indeed, it is not clear from the Amended Complaint which, if any, of Plaintiffs received such an offer. Nor is it explained how the buyback offers were false or misleading other than the conclusory labeling of such offers as "fraudulent." *See* AC ¶ 280. Again,

---

[5] Additionally, it is undisputed that BlueGreen had no involvement with TMC at that time of the NYAG's investigation. As a result, the AOD and the Farooq Affirmation cannot form the basis for any of BlueGreen's allegedly fraudulent conduct.

13

the only "fraudulent" aspect of the Buy Back Scheme seems to be the Eichner Defendants' promise to purchase TMC members' interests at the initial purchase price if TMC members were unable to sell their interests to the general public. To the extent there was fraud then, it was part of the Purchase Scheme. But, because Plaintiffs have disclaimed misstatements related to the Purchase Scheme as predicates for their RICO claim, Plaintiffs' allegations here amount to no more than claim for breach of contract, which, as discussed above, is insufficient to state a fraud claim.

Accordingly, the Amended Complaint does not plead a pattern of racketeering activity. And, as a result, Plaintiffs' RICO claim fails.

### C. Timeliness

Separately, the Eichner Defendants argue that Plaintiffs' claims are untimely. The statute of limitations for a civil RICO claim is four years. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013) (citation omitted). In the Second Circuit, courts apply the "accrual rule, under which the limitations period begins to run 'when the plaintiff discovers or should have discovered the RICO injury.'" *Id.* (quoting *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58 (2d Cir. 1998)). "While determining inquiry notice often presents questions of fact more appropriate for a trier of fact, 'nonetheless the test is an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings.'" *Koch v. Christie's Int'l PLC*, 785 F. Supp. 2d 105, 114 (S.D.N.Y. 2011) (quoting *Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402, 1408 (S.D.N.Y.1996)), *aff'd*, 699 F.3d 141 (2d Cir. 2012). Here, however, the Court is unable to evaluate the timeliness of Plaintiffs claims because the deficiently pleaded Amended Complaint fails to identify when, if ever, Plaintiffs were injured by the alleged RICO scheme. As Plaintiffs otherwise

fail to state a RICO claim, the Court need not take a position on the timeliness of Plaintiffs' claims. If Plaintiffs choose to amend their pleading, the Court will take up this issue at that time.[6]

### D. Supplemental Jurisdiction

The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. The Court has discretion to hear such claims pursuant to 28 U.S.C. § 1367(a), which states:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). Under 28 U.S.C. § 1367(c)(3), however, the exercise of supplemental jurisdiction over a party's remaining state law claims is within the Court's discretion if it has "dismissed all claims over which it has original jurisdiction." The Second Circuit counsels against exercising supplemental jurisdiction in this circumstance: "'[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.'" *First Capital Asset Mgmt.,* 385 F.3d at 183 (quoting *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991)). Accordingly, because the Court has dismissed all of Plaintiffs claims that are based on a federal question under 28 U.S.C. § 1331, and because there is no other basis for jurisdiction over this case, the Court declines to exercise its supplemental jurisdiction over Plaintiffs' state law claims.

---

[6] Likewise, the Court declines to address the potential standing issues raised in the Eichner Defendants' Motion to Dismiss with respect to several individual Plaintiffs. "A district court properly dismisses an action under Fed R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it,' such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telcomms., S.a.r.l.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). Here, while the Eichner Defendants raise issues with several Plaintiffs' standing, the standing of over 150 Plaintiffs is unchallenged. Thus, the Court has the constitutional authority to adjudicate this motion. Should Plaintiffs choose to replead and to reassert claims on behalf of the individual Plaintiffs whose standing was challenged, however, the Court will invite a substantive response from Plaintiffs regarding the standing issues raised by Defendants.

## IV. CONCLUSION

As pleaded, this case continues the longstanding, unfortunate tradition of dressing up state claims for common law fraud and breach of contract as violations of the civil RICO statue. *See, e.g., Plount v. Am. Home Assurance Co.*, 668 F. Supp. 204, 205 (S.D.N.Y. 1987) (describing the "flood" of state claims filed as civil RICO cases by parties seeking treble damages and a federal forum). Because of the deficiency of the Plaintiffs' RICO allegations, this Court, unlike a court of general jurisdiction, need no take up Plaintiffs' state law claims. For the reasons stated above, Defendants' motions to dismiss are GRANTED without prejudice as to Plaintiffs' RICO claims (Count 7). Having dismissed the only claims creating federal jurisdiction, this Court declines to exercise supplemental jurisdiction over the remaining state law claims. Accordingly, those claims are dismissed, also without prejudice. The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 71 and 88.

SO ORDERED.

Dated: September 27, 2021  
New York, New York

_____  
GREGORY H. WOODS  
United States District Judge