USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/26/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
CHARLES R. ACKLIN, *et al.*,                                    :
                                                               :
                                   Plaintiffs,  :
                                                               :            1:20-cv-7042-GHW
                -against-                                       :
                                                               :            MEMORANDUM OPINION &
IAN BRUCE EICHNER; LESLIE H.                                    :                    ORDER
EICHNER; STUART P. EICHNER; SCOTT L.                            :
LAGER; T. PARK CENTRAL LLC; O. PARK                            :
CENTRAL LLC; PARK CENTRAL                                       :
MANAGEMENT, LLC; MANHATTAN CLUB                                 :
MARKETING GROUP, LLC; NEW YORK                                  :
URBAN OWNERSHIP MANAGEMENT, LLC;                                :
*and* BLUEGREEN VACATIONS UNLIMITED,                            :
INC.,                                                          :
                                                               :
                                   Defendants.  :
----------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

        Plaintiffs are individuals and trusts who were pitched a deal:  timeshare interests in a

Manhattan building at a low annual cost, with readily available short-term reservations and the ability

to sell back their timeshare interests at the original purchase price.  Following their purchase of the

timeshare interests, Plaintiffs found that the deal had been too good to be true, with high annual

fees, significant difficulty in making reservations, and a $100 buy-back offer for their timeshare

interests in exchange for forgiveness of any overdue annual fees.

        Riding on the back of an investigation by the New York Attorney General (the "NYAG"),

Plaintiffs bring suit against Defendants for their operation and management of the timeshare

interests, asserting 12 different claims under federal, New York, and Pennsylvania law.  Plaintiffs'

federal claims arise under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), based

on Plaintiffs' contention that Defendants engaged in "fraudulent" conduct that amount to mail or

wire fraud.  But "fraudulent" does not mean any type of misconduct—and because Plaintiffs fail to

specifically plead that Defendants engaged in any type of deception to cause injury to Plaintiffs, their RICO claims must fail.  Accordingly, the Court finds that Plaintiffs have failed to state a plausible claim for relief under RICO and GRANTS Defendants' motions to dismiss.  The Court also declines to exercise supplemental jurisdiction over the remaining state law claims and dismisses all of Plaintiffs' claims.

## I.     BACKGROUND

### A.     Facts[1]

The Manhattan Club Association, Inc. ("TMC") is a not-for-profit organization that operates and sells interests in timeshares located at 200 West 56th Street, New York, NY.  Dkt. No. 111 ¶ 1 & n.1 ("Second Amended Complaint" or "SAC"); Dkt. No. 111-6 at ECF p. 1 ("Assurance of Discontinuance" or "AOD").  TMC is not a Defendant in this case.

#### 1.     *The Parties*

Plaintiffs are 222 individuals and trusts who purchased timeshare interests in TMC.[2]  SAC ¶¶ 14–161.

Defendants are Ian Bruce Eichner, Leslie H. Eichner, Stuart P. Eichner (together, the "Individual Eichner Defendants"), Scott L. Lager, T. Park Central LLC ("T. Park"), O. Park Central LLC ("O. Park"), Park Central Management, LLC ("Park Central"), Manhattan Club Marketing Group LLC ("Marketing"), New York Urban Ownership Management, LLC ("Urban") (together, with the Individual Eichner Defendants, the "Eichner Defendants"), and BlueGreen Vacations Unlimited, Inc. ("BlueGreen").  Plaintiffs allege that TMC is an enterprise—through which

---

[1] Unless otherwise noted, the following facts are drawn from the Second Amended Complaint, Dkt. No 111, and the documents attached to the Second Amended Complaint, and they are accepted as true for the purposes of evaluating Defendants' motions to dismiss.  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] The Second Amended Complaint does not specify the dates on which some Plaintiffs purchased their TMC timeshare interests.  *See, e.g.*, SAC ¶¶ 17, 47, 113, 160.

Defendants perpetrated their alleged racketeering activities—for the purposes of Plaintiffs' RICO claims. *Id.* ¶ 292.

Defendants T. Park, O. Park, Park Central, Marketing, and Urban are New York limited liability companies with principal offices in New York, New York. *Id.* ¶¶ 168–172. At relevant times,[3] Defendants T. Park and O. Park have been "Sponsors" of TMC. SAC ¶¶ 168–169. Defendant Park Central is the managing member of T. Park and O. Park and an undisclosed principal of TMC. *Id.* ¶ 170. Defendant Marketing is the selling agent for offering TMC timeshare interests. *Id.* ¶¶ 171, 177. Defendant Urban, pursuant to a Management Agreement between Urban and TMC, is responsible for managing the day-to-day operations of TMC, including its reservation system. *Id.* ¶¶ 167, 172, 175.

Defendant Ian Bruce Eichner is a managing member of Urban and of TMC; Defendant Leslie H. Eichner is a member of Urban and Marketing; and Defendant Stuart P. Eichner is the President of TMC and a member of Urban and Marketing. *Id.* ¶¶ 162–164. All three Individual Eichner Defendants are managing members of Park Central. *Id.* ¶ 166. Defendant Scott L. Lager is the Vice President of TMC and the manager of Hospitality Advisors LLC, a non-voting member of Urban. *Id.* ¶ 167. Stuart Eichner and Mr. Lager also served on TMC's Board of Directors from at least 2011 to 2017. *Id.* ¶ 183.

Defendant BlueGreen is a timeshare operator that became a Sponsor of TMC in June 2018, pursuant to an agreement with the Eichner Defendants to assume the position. *Id.* ¶¶ 178, 180. BlueGreen appears to no longer be a Sponsor. *See id.* ¶ 220.

---

[3] The Second Amended Complaint uses the broadly worded phrase "at relevant times" to describe the involvement of each corporate Defendant but does not specify the actual time periods for each Defendant's role in TMC. *See* SAC ¶¶ 162–173.

3

## 2.   Purchase of Timeshare Units[4]

Between approximately 1996 and 2013,[5] Plaintiffs purchased timeshare units in TMC and became TMC members.  *Id.* ¶¶ 14–161.  The purchase and management of the TMC timeshare interests are governed by a number of documents, including the Timeshare Reservation Rules, Offering Plan, and Bylaws.  *Id.* ¶ 3; *see also* Dkt. No. 111-1 to -3.

At the time of purchase, Defendants Marketing and Urban made a number of representations to Plaintiffs during sales presentations, including that the Sponsor would buy back Plaintiffs' timeshare interests at the purchase price, that the annual maintenance fee charged to TMC members would not increase more than the cost of living (and indeed would likely decrease as additional timeshare interests were sold), and that TMC members could easily make reservations to use their timeshare interests whenever they wanted, including for same-day or short-notice reservations.  SAC ¶¶ 225, 228–229, 231–232.

## 3.   Plaintiffs' Experience as TMC Members

Plaintiffs' actual experience as TMC members fell far short of what they had been told at the sales presentations.

First, Plaintiffs found that the annual maintenance fee charges increased substantially and quickly.  *Id.* ¶¶ 239–240.  Urban, TMC's management company, sent Plaintiffs annual maintenance fee statements, calculated based on the estimated annual operating budget for TMC, by mail.  *Id.* ¶¶ 188–190.  According to Plaintiffs, the budget reflected over- or understated annual revenue and expenses, including by listing maintenance fees as revenue regardless of whether such fees were

---

[4] Plaintiffs refer to the alleged misrepresentations and omissions made at purchase as the "Purchase Scheme."  SAC at 42.  During the prior round of Defendants' motions to dismiss, Plaintiffs disclaimed the Purchase Scheme as the basis for their RICO claim.  *See* Dkt. No. 98 at 12.  Plaintiffs continue to not rely on the Purchase Scheme to assert their claims under RICO.  *See* SAC ¶¶ 290–317.

[5] The Second Amended Complaint does not specify the dates on which some Plaintiffs purchased their TMC timeshare interests.  *See, e.g.*, SAC ¶¶ 17, 47, 113, 160.  The initial offering plan for TMC appears to have been dated 1996.  *See* Dkt. No. 111-6 ¶ 24.

4

actually received and reserving too little for "bad debt" than was actually needed. *Id.* ¶¶ 190, 195–197, 200. The budget also included a management fee, to be paid to Urban, that was calculated as a set percentage of the annual budget, and Plaintiffs allege that Defendants were incentivized to help Urban earn a higher management fee. *Id.* ¶¶ 190–191. At times, Defendants also billed or charged Plaintiffs for their annual maintenance fees far in advance of their due dates, allegedly to satisfy Defendants' cash flow needs, or allegedly demanded and harassed Plaintiffs for an early payment of their maintenance fees. *Id.* ¶¶ 193–194, 210. Plaintiffs further allege that Defendants failed to disclose with the maintenance fee statements these and other details, such as the Eichner Defendants' purported conflict of interest in renting out rooms from their own inventory as well as TMC members' timeshare interests for the Transient Rental Program. *Id.* ¶¶ 1 n.1, 201–202, 233–240.

Second, Plaintiffs found that the process of making reservations to use their TMC timeshares was considerably more difficult than anticipated: On numerous occasions, Urban denied reservation requests made by Plaintiffs, including short-notice reservations, on the basis that no rooms were available. *Id.* ¶¶ 204–206. Purportedly, this happened in part because the Eichner Defendants used the inventory of rooms allocated to TMC members for other purposes, such as the Transient Rental Program. *Id.* ¶ 207. Plaintiffs were also required to pay their annual maintenance fees in advance in order to make a reservation. *Id.* ¶ 208. Plaintiffs allege that Defendants failed to disclose these and other details regarding TMC's reservation system. *Id.* ¶¶ 241–247, 249.

Third, Plaintiffs found that they were not able to sell back their TMC timeshare interests to the Sponsors at the original purchase price. *Id.* ¶ 6. Instead, the Sponsors, through Urban, "fraudulently" offered to buy back the TMC timeshare interests of TMC members who were in arrears on their annual maintenance fee payments, in exchange for $100 and the forgiveness of the arrearages. *Id.* ¶ 213. Plaintiffs allege, in connection with the buy-back offers, that the buy-back

offers benefited the Sponsors but not TMC.  *Id.* ¶ 215.  Plaintiffs also assert that the Sponsors owed

maintenance fees to TMC but did not pay them, instead pocketing the proceeds from the Transient

Rental Program.  *Id.* ¶ 216.  Again, Plaintiffs allege that Defendants failed to disclose these and other

details regarding TMC's buy-back offers—or lack thereof—in advance.  *Id.* ¶¶ 215, 248, 253–254.

### 4.      *NYAG Investigation*

On August 14, 2017, the NYAG entered into an Assurance of Discontinuance with the

Eichner Defendants[6] following an investigation into—and a related legal proceeding regarding—the

Eichner Defendants' conduct in connection with the offer and sale of TMC timeshare interests.

SAC ¶ 4 & n. 2; *see also* Dkt. No. 111-6 (AOD).  The NYAG found that the Eichner Defendants had

violated New York's Martin Act, which governs fraudulent practices in the public offer and sale of

securities.  *See* AOD ¶¶ 14, 57 (citing N.Y. General Business Law § 352 *et seq.*).  As part of the

Assurance of Discontinuance, the Eichner Defendants agreed to:  not engage in any act relating to

"the offer, purchase, sale, issuance, advertisement, marketing, promotion, distribution, negotiation,

exchange or transfer of any timeshare interest";[7] transfer their TMC interests to a third-party

approved by the NYAG; and pay $6.5 million as restitution, to be disbursed to TMC timeshare

purchasers.  *Id.* ¶¶ 58–69.[8]

---

[6] The AOD included the non-Defendant Hospitality Advisors as well.  AOD ¶ 12.

[7] Plaintiffs allege that any post-August 14, 2017 buy-back offers are "fraudulent" because they are prohibited by the AOD.  SAC ¶ 214.

[8] If "a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true."  *Owoyemi v. Credit Corp Sols. Inc.*, 596 F. Supp. 3d 514, 518 (S.D.N.Y. 2022) (internal quotation marks and citation omitted).  On the other hand, "at the pleading stage, although we must consider the words on the page [of a separate report] (that is, we cannot disregard the fact that the . . . reports make particular findings), we need not consider the truth of those words to the extent disputed by Plaintiffs."  *Turkmen v. Hasty*, 789 F.3d 218, 226 n. 6 (2d Cir. 2015), *judgment rev'd in part, vacated in part on other grounds sub nom. Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).  This is because "reliance on any assertion of fact requires a credibility assessment that we are fundamentally unsuited to undertake at the Rule 12(b)(6) stage."  *Id.*  Accordingly, the Court does not accept as true the factual findings contained in the AOD to the extent that they are contrary to Plaintiffs' allegations in the Second Amended Complaint.  *See also* AOD ¶ 78 (noting the AOD "may not be used by any third party in any other proceeding and is not intended, and shall not be construed, as an admission of liability by the [Eichner Defendants] in any other proceeding").

In March 2018,[9] BlueGreen—who appears to be the third-party transferee referenced in the Assurance of Discontinuance—entered into an Asset Purchase Agreement ("APA") with the Eichner Defendants to acquire the remaining unsold timeshare units held by the Eichner Defendants.  SAC ¶ 7 & n. 4, 178; *see also* Dkt. No. 111-8 (APA).  As part of the APA, BlueGreen assumed the role of TMC's Sponsor and obtained the right to appoint four out of the seven seats on TMC's Board of Directors.  SAC ¶¶ 7 n. 4, 283.  At an unidentified time, BlueGreen ceased to be a Sponsor, and the Eichner Defendants[10] resumed their roles as Sponsor.  *Id.* ¶ 220 (referencing "the Eichner Defendants after they resumed control as TMC's Sponsor").  Plaintiffs allege that, during its time as a Sponsor, BlueGreen "ratified and continued the wrongful practices . . . as regards charging fraudulently determined annual maintenance fees, employing a fraudulent reservations scheme, and making fraudulent buy back offers . . . ."  *Id.* ¶ 179; *see also id.* ¶ 277 (noting Plaintiffs continued to have difficulties making reservations during BlueGreen's tenure as Sponsor).

## B.    Procedural History

On August 30, 2020, Plaintiffs commenced this action, asserting claims under the federal RICO Act, fraud, breach of contract, tortious interference, and violations of New York General Business Law § 349 ("GBL").  Dkt. Nos. 1, 17.[11]  BlueGreen moved to dismiss the complaint, Dkt. No. 71, followed by the Eichner Defendants' motion to dismiss the complaint, Dkt. No. 88.  On September 27, 2021, the Court dismissed Plaintiffs' RICO claims without prejudice and declined to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, dismissing the state law claims without prejudice as well.  Dkt. No. 98 at 2 ("First MTD Opinion").

---

[9] While the Second Amended Complaint represents that BlueGreen entered into the APA in June 2018, the actual APA is dated March 2018.  *See* APA at 1.

[10] The Second Amended Complaint does not identify the original Sponsors consistently.  T. Park and O. Park are each defined as a Sponsor, *see* SAC ¶¶ 168–169, but Plaintiffs frequently refer generally to the Eichner Defendants as the Sponsor as well, *see, e.g.*, *id.* ¶¶ 5, 220.

[11] Plaintiffs amended the complaint twice in rapid succession after commencing the action.  *See* Dkt. No. 16 (August 31, 2020 amended complaint); Dkt. No. 17 (September 2, 2020 amended complaint).  The operative complaint for the purposes of the first motion to dismiss was at Dkt. No. 17.

At Plaintiffs' request, the Court granted Plaintiffs leave to amend the complaint to address the deficiencies identified in the First MTD Opinion.  Dkt. No. 103.  Plaintiffs filed an amended complaint, asserting violations of RICO, fraud, breach of contract, fraudulent inducement, tortious interference with a contract, breach of fiduciary duty, violations of GBL § 349, and violations of the Pennsylvania Securities Act of 1972 §§ 1-401, 1-408.  *See* SAC.[12]

The Eichner Defendants and BlueGreen now move to dismiss the Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).  Dkt. No. 119 ("BlueGreen Motion to Dismiss"); Dkt. No. 120 ("BlueGreen Brief"); Dkt. No. 121 ("Eichner Motion to Dismiss"); Dkt. No. 122 ("Eichner Brief"); *see also* Dkt. Nos. 126, 127 (reply briefs).  Plaintiffs oppose.  Dkt. No. 124 ("Eichner Opp."); Dkt. No. 125 ("BlueGreen Opp.").

## II.    LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted."  *Id.* 12(b)(6).  In a motion to dismiss under Rule 12(b)(6), the court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor.  *DiFolco v.*

---

[12] Plaintiffs filed a series of amended complaints between November 15, 2021 and November 25, 2021, due at least in part to issues with exhibits and deficiencies identified by the Clerk of Court.  *See* Dkt. Nos. 104, 105, 108, 109, 111. BlueGreen argues Plaintiffs impermissibly flouted the Court's order directing that any amended complaint be filed no later than November 15, 2021 by making substantive changes to the complaint in these iterations and argues that the impermissible amended complaints should be considered "nullities."  *See* Dkt. No. 120 at 6 & n. 2.  The Court treats Plaintiffs' latest amended complaint, filed on November 25, 2022, as the operative complaint, even though Plaintiffs filed it without complying with Rule 15(a).  The Court has discretion to grant requests for leave to amend *nunc pro tunc* when parties file amended pleadings without complying with Rule 15(a)(2).  *See, e.g.*, *Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021) (citing cases).  The parties have already expended substantial time and effort on these motions to dismiss the latest amended complaint:  BlueGreen itself, as well as the Eichner Defendants, treats the latest amended complaint as the operative complaint for the purposes of arguing that Plaintiffs have not stated a claim for relief.  BlueGreen also does not suggest that the Court would have denied Plaintiffs leave to amend had it been requested at the appropriate time.  Accordingly, the Court will exercise its discretion under Rule 15(a) to treat the November 25, 2022 as the operative complaint.  Because the Court's prior opinion addressed the then-operative complaint found at Dkt. No. 17 as the "Amended Complaint," the Court refers to the operative complaint for the purposes of this opinion as the "Second Amended Complaint," Dkt. No. 111.

*MSNBC Cable L.L.C.*, 622 F.3d 104, 110–11 (2d Cir. 2010).  However, "[t]he tenet that a court must accept as true a complaint's factual allegations does not apply to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To survive dismissal under Rule 12(b)(6), a complaint must allege sufficient facts to state a plausible claim.  *Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Iqbal*, 556 U.S. at 678).  The plaintiff's claim must be more than "speculative."  *Twombly*, 550 U.S. at 545.  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 544).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *DiFolco*, 622 F.3d at 111.  A court may also consider documents that are "integral to" the complaint, meaning that the complaint relies heavily upon its terms and effects.  *Id.*  "[E]ven if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."  *Id.* (internal quotation marks omitted) (quoting *Faulkner v. Beer*, 463 F.3d 130,

9

134 (2d Cir. 2006)).  "It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document."  *Id.* (quoting *Faulkner*, 463 F.3d at 134).

## III.   DISCUSSION

Plaintiffs assert twelve causes of action against Defendants:  (1) a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c), based on alleged wire and mail fraud, *id.* §§ 1341, 1343; (2) a conspiracy to violate RICO, *id.* § 1962(d), based on alleged wire and mail fraud, *id.* §§ 1341, 1343; (3) three claims of breach of contract; (4) tortious inference with contract; (5) a violation of GBL § 349; (6) common law fraud; (7) fraudulent inducement; (8) a breach of fiduciary duty pursuant to New York Not-For-Profit Corporation Law § 701; (9) a violation of the Pennsylvania Securities Act of 1972, 70 Pa. Const. Stat. § 1-401; and (10) a "tort of negligence" claim "based on" a violation of 70 Pa. Const. Stat. § 1-408.  SAC ¶¶ 290–434.

### A.      Plaintiffs' Claim of Pattern of Racketeering Activity Under RICO

To establish a RICO violation under 18 U.S.C. § 1962, Plaintiffs must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001)).  "Racketeering activity encompasses, among other things, any act indictable for crimes enumerated under 18 U.S.C. § 1961(1)(B), which include . . . acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343)."  *Bigsby v. Barclays Capital Real Estate, Inc.*, 298 F. Supp. 3d 708, 716–17 (S.D.N.Y. 2018), *aff'd*, 841 F. App'x 331 (2d Cir. 2021).

The federal mail and wire fraud statutes penalize the use of the mail or a wire communication to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quoting 18 U.S.C. §§ 1341, 1343).  Therefore, a complaint alleging

mail and wire fraud must plead "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *Id.*

A RICO claim based on mail or wire fraud is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Farag v. XYZ Two Way Radio Serv., Inc.*, No. 22-1795, 2023 WL 2770219, at *1 (2d Cir. Apr. 3, 2023) (summary order) (affirming dismissal of RICO mail fraud claim for failure to meet Rule 9(b) standard). Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), a claim of fraud must be supported by allegations "that give rise to a strong inference of fraudulent intent." *S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996). A plaintiff can satisfy this requirement by "(1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

Rule 9(b) serves to "provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)). "When the predicate acts of a civil RICO claim are grounded in fraud, the concerns associated with pleading fraud with particularity take on even greater importance." *Mathon v. Feldstein*, 303 F. Supp. 2d 317, 322–23 (E.D.N.Y. 2004); *see also Nat'l Union Fire Ins. Co. of Pittsburgh v. Archway Ins. Servs. LLC*, No. 11 Civ. 1134 (WHP), 2012

WL 1142285, at *3 (S.D.N.Y. Mar. 23, 2012) ("[C]ivil RICO has resulted in a flood of what are and should be state court cases that are being refrained and brought in federal court as RICO actions . . . .  As a result, courts scrutinize RICO claims, particularly those based solely on predicate acts of wire fraud." (alteration in original) (internal quotation marks and citations omitted)).

Plaintiffs' allegations of mail and wire fraud center on three types of "fraudulent" activities by Defendants:  (1) maintenance fee statements; (2) implementation of TMC's reservation policies; and (3) offers to buy back timeshare interests from TMC members.  As described below, Plaintiffs have failed to adequately plead that any of this conduct was a "scheme to defraud" and therefore fail to state a claim against Defendants for a pattern of racketeering activity in violation of RICO.  *See Greenberg*, 835 F.3d at 305 (elements of mail or wire fraud).

### 1.   *Maintenance Fee Statements*

Plaintiffs allege that Defendants engaged in a pattern of racketeering activity by "using the mail to send fraudulent annual maintenance fee statements each year to Plaintiffs and other TMC members" that reflected inflated maintenance fees.  SAC ¶¶ 2, 295; *see also* ¶¶ 188–203.  Plaintiffs fail to adequately plead that Defendants' conduct was "a scheme to defraud," however, because Plaintiffs do not plead any deception or injury to Plaintiffs caused by the alleged conduct.

Plaintiffs' first basis for asserting that the annual maintenance fee statements sent to Plaintiffs and other TMC members are "fraudulent" is that "they are calculated based on estimated budgets," which in turn allegedly over- or understate TMC's revenue and expenses.  SAC ¶ 190.[13] Plaintiffs essentially allege that Urban—as the management company of TMC—is paid a management fee that is tied to TMC's annual budget,[14] and Defendants are incentivized to artificially

---

[13] TMC's annual budget is disclosed with the annual maintenance fee statements.  SAC ¶ 203.
[14] The Second Amended Complaint does not make it clear what Urban's management fee is tied to, describing it in two successive paragraphs as "a percentage of TMC's estimated annual operating budget"—rather than revenue—or "up to 20% of TMC's annual assessment of maintenance fees plus transient rentals and other income . . . ."  SAC ¶¶ 190–191.

inflate the TMC budget to help Urban earn a higher management fee.  *See id.*  The alleged errors in

the budget include:

- The budget "overstates" anticipated maintenance fee payments as revenue, because not all maintenance fees are actually received, and the budget also "understates" anticipated unpaid maintenance fees ("bad debt") as expenses, because they are lower than the overdue maintenance fees from the immediately preceding year.  SAC ¶¶ 190, 195–197.[15]

- The budget "appears to fraudulently incur management fees in connection with the rental of unreserved nights" in contravention of the Timeshare Reservation Rules, which do not permit the TMC Board of Directors to pay any funds from the rental of unreserved nights to Urban.  SAC ¶ 192; *see also* Eichner Opp. at 4 (stating it was fraudulent to "include as income used to calculate the management fees paid to Urban revenue earned from the rental of unreserved nights").  Plaintiffs' allegations suggest that Urban's management fee was too high because the annual budget inappropriately counted the revenue earned from "the rental of unreserved nights," which in turn raised Urban's management fee.[16]

- The budget "falsely include[s] as TMC revenue[] money earned from the Transient Rental Program that is ostensibly supposed to be used to pay the hundreds of thousands of dollars in maintenance fee arrearages owed to TMC by the Eichner Defendants, which moneys [*sic*] are in fact not used to pay such arrearages despite millions of dollars being earned from transient rentals but are instead paid to Urban and then in turn to the individual Eichner [Defendants]."  SAC ¶ 200.  Plaintiffs appear to allege that, again, Urban's management fee was too high because the annual budget reflected higher revenue than it should have due to the Transient Rental Program revenue.  Plaintiffs also appear to assert that the Transient Rental Program revenue should have been used to pay the Sponsor's overdue maintenance fees to TMC.

    In all of this, however, Plaintiffs fail to plead adequately that Defendants' purported conduct

proximately caused any injury to Plaintiffs.  "[A] plaintiff suing under RICO must establish that the

RICO offense was the 'proximate cause' of the plaintiff's injuries."  *Empire Merchants, LLC v. Reliable*

*Churchill LLLP*, 902 F.3d 132, 141 (2d Cir. 2018) (citing *Holmes v. Secs. Investor Protection Corp.*, 503

U.S. 258, 268 (1992)).  "Proximate cause . . . requires some direct relation between the injury

asserted and the injurious conduct alleged, and [a] link that is too remote, purely contingent, or

indirec[t] is insufficient."  *Id.* (alterations in original) (internal quotation marks and citation omitted).

---

[15] Elsewhere, Plaintiffs criticize the budget for "overstating" expenses because it includes *any* "bad debt."  SAC ¶ 190.
[16] It is not clear whether "the rental of unreserved rooms" is the Transient Rental Program or if Plaintiffs refer to two different rental programs.

While the allegations outlined above point to alleged faults in TMC's *budget*, Plaintiffs do not adequately plead the correlation between the alleged errors in the budget and the maintenance fee statements.  At best, Plaintiffs allege that the maintenance fee statements are "based on" TMC's budget—but such a generalized statement does not explain how the maintenance fee is determined by the budget, even so much as whether certain aspects of the budget increases the maintenance fee charged to Plaintiffs.  *See* SAC ¶¶ 190, 200.  Plaintiffs do not, for example, assert that lower revenues from other sources or higher expenses reflected on the annual budget would have resulted in higher maintenance fees charged to Plaintiffs.  Nor has the Court been provided with a copy of the annual budgets and maintenance fee statements to be able to draw such an inference.[17]  Plaintiffs also fail to plead how a higher management fee paid to Urban injures *Plaintiffs* rather than TMC, which presumably incurred the cost of Urban's management fee, as Plaintiffs do not purport to bring a derivative action on behalf of TMC.  In short, Plaintiffs fail to allege the causal link between the faults they find in TMC's annual budget and the annual maintenance fee statements received by Plaintiffs with the specificity required to satisfy Rule 9 standards.[18]

Even if Plaintiffs had adequately pleaded that their maintenance fee statements were causally linked to the line items of TMC's budget with which they find fault, including the management fee paid to Urban, Plaintiffs still fail to plead fraudulent conduct on the part of any or all of the Defendants.  A "scheme to defraud" for the purposes of mail or wire fraud requires "some element of deception."  *McLaughlin v. Anderson*, 962 F.2d 187, 193 (2d Cir. 1992) ("This element of deception

---

[17] Plaintiffs only attach the 2012 annual budget, which is included in the 2012 Offering Plan attached to the Second Amended Complaint and appears to reflect the budget from over 10 years ago.  *See* Dkt. No. 111-2 at ECF p.51.  Plaintiffs do not cite to the 2012 budget in pleading facts about the maintenance fee statements or otherwise represent that the 2012 budget is substantially similar to subsequent budgets.

[18] Plaintiffs' own allegations do not seem to support the notion that the faults Plaintiffs find with the annual budget resulted in *increases* to the maintenance fee:  Plaintiffs allege that the budget *under*states expenses and *over*states revenue, either which would presumably *lower* maintenance fee charges.  SAC ¶¶ 192, 195, 200.  Plaintiffs also allege that the budget *over*estimates revenue by counting on the full collection of maintenance fees, but that does not explain how the anticipated maintenance fees—presumably what was charged to TMC members—were determined.

requirement is satisfied where the mailing itself is misleading or where there is some other deception

which the mailing serves.  Here, there is neither." (citations omitted)); *accord Williams v. Affinion Grp.,*

*LLC*, 889 F.3d 116, 124 (2d Cir. 2018) ("A 'scheme to defraud' is a plan to deprive a person of

something of value by trick, deceit, chicane or overreaching.  To make out such a scheme, a plaintiff

must provide proof of a material misrepresentation." (internal quotation marks and citation

omitted)).  Plaintiffs do not allege that the annual maintenance fees reflected on the statements they

received, the TMC annual budget, or the revenue from "the rental of unreserved nights" or the

Transient Rental Program were fabricated or otherwise false.

Instead, Plaintiffs object to *how* these items, including the budget and Urban's management

fee, were calculated.  Plaintiffs find fault with the purported failure to accurately predict the actual

revenue (*e.g.*, how much of the maintenance fees would be paid) and expenses (*e.g.*, how much of the

maintenance fees would remain unpaid) for TMC in the upcoming year, as well as the decision to

factor in revenue from the rental of unreserved nights or the Transient Rental Program as revenue

for TMC.  These are judgment calls made in determining TMC's annual budget; they do not plead

with the specificity required by Rule 9(b) any "element of deception."[19]  Plaintiffs' dispute as to

whether "incur[ring] management fees in connection with the rental of unreserved nights" was in

violation of the Timeshare Reservation Rules also adequately plead an "element of deception"—

simply alleging a failure to adhere to the terms of an agreement is not a "scheme to defraud."  *See,*

*e.g.*, *Bigsby*, 298 F. Supp. 3d at 721 (holding RICO claims failed because the alleged scheme

"consisted of, at most, breaches of . . . contracts rather than fraud").[20]  Accordingly, Plaintiffs fail to

---

[19] Indeed, the 2012 budget—the only budget available for the Court's review—specifically discloses:  "The foregoing budget . . . is not intended and should not be taken as a guarantee.  It is likely that the actual Timeshare Expenses for the 2012 calendar year operations will vary from the amounts shown in Schedule B."  Dkt. No. 111-2 at ECF p.56.  Further, *higher* revenue from other sources, such as the Transient Rental Program, would presumably result in *lower* maintenance fees required of TMC members—which Plaintiffs do not address.

[20] Indeed, Plaintiffs allege that the purported violation of the Timeshare Reservation Rules was not withheld or misrepresented, but instead disclosed in the annual budget.  SAC ¶¶ 192, 203.

explain why the annual maintenance fee statements were fraudulent, as required by the heightened pleading requirements of Rule 9(b).  *See ATSI Commc'ns, Inc.*, 493 F.3d at 99.

Plaintiffs' second basis for asserting that the annual maintenance fee statements are "fraudulent" is that Plaintiffs were billed for or charged the maintenance fees before the due dates, sometimes up to nine months in advance of the due date, "to satisfy the Defendants' needs for cash flow . . . ."  SAC ¶¶ 193–194.  Allegations of "demand[ing] in a harassing manner" the early payment of the fees—while perhaps troubling—do not plead deception by themselves.  *See, e.g.*, *A. Terzi Prods., Inc. v. Theatrical Protective Union*, 2 F. Supp. 2d 485, 499–500 (S.D.N.Y. 1998) ("The scheme alleged here—that defendants coerced plaintiffs into entering a labor agreement through threatening and abusive conduct—contains no element of deception whatsoever[,] . . . [though it] may have been wrongful, even reprehensible . . . .").  Plaintiffs do not allege, for example, that they were told that the due date for the annual maintenance fees were earlier than they actually were.  Plaintiffs again fail to plead any "element of deception" sufficient to plead a "scheme to defraud."  *See McLaughlin*, 962 F.2d at 193.[21]

Plaintiffs' third basis for asserting that the annual maintenance fee statements are "fraudulent" is the purported failure to disclose certain information.  SAC ¶¶ 198–199, 201–202. Chief among these is an alleged conflict of interest:  namely, that the Eichner Defendants have a financial incentive to rent out their own inventory of rooms *and* the rooms owned by other TMC members for the Transient Rental Program, and that they "acted to materially advance their own interests rather than TMC's to which they owe a fiduciary duty."[22]  *Id.* ¶ 201.

---

[21] Plaintiffs assert that these demands for early payment of the maintenance fees were made "without regard to the Plaintiffs' or members' contractual obligations."  *See* Eichner Opp. at 4–5.  A breach of contract is not fraud.  *See, e.g.*, *Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir. 1999) ("Breach of contract is not fraud, and a series of broken promises therefore is not a pattern of fraud.  It is correspondingly difficult to recast a dispute about broken promises into a claim of racketeering under RICO."); *Bigsby*, 298 F. Supp. 3d at 721.

[22] As an initial matter, this assertion fails for the simple reason that this is a conclusory assertion that states a violation of law rather than providing a plausible claim with the specificity required by Rule 9(b)—notably, Plaintiffs do not allege the *actual action* the Eichner Defendants took in "act[ing] to materially advance their own interests rather than TMC's."

Mail or wire fraud can be based on either affirmative misrepresentations or "by omissions of material information that the defendant has a duty to disclose." *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000). A fiduciary duty can give rise to a duty to disclose. *Id.*; *see also United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002) ("[W]hen dealing with a claim of fraud based on material omissions, it is settled that a duty to disclose arises [only] when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." (second and third alteration in original) (internal quotation marks and citation omitted)). "[A] fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 497 (S.D.N.Y. 2017) (internal quotation marks and citation omitted). "[A]n arms-length commercial transaction generally does not give rise to a fiduciary relationship." *Id.* at 498 (alteration in original) (internal quotation marks and citation omitted).

Plaintiffs have failed to plead a duty that any Defendant owed them to disclose the purported omissions from the maintenance fee statements. Plaintiffs merely assert that the Eichner Defendants owed a fiduciary duty to *TMC*. SAC ¶ 201 (Eichner Defendants "acted to materially advance their own interests rather than TMC's to which they owe a fiduciary duty"); *see also id.* ¶ 236 (noting "the Eichner Defendants owing a fiduciary duty to TMC"). Again, Plaintiffs are not bringing a derivative action on behalf of TMC. *Cf. Caprer v. Nussbaum*, 825 N.Y.S.2d 55, 68 (2d Dep't 2006) (holding that a condo owner "may bring a derivative action on behalf of the condominium" but may not generally "sue individually to protect his or her interest in the common elements of the condominium"). Plaintiffs fail to allege that Defendants owe a fiduciary duty—or any other duty to disclose—to Plaintiffs.

Plaintiffs also fail to allege in sufficient detail which Defendant owes a fiduciary duty to them. *See Sheppard v. Manhattan Club Timeshare Ass'n, Inc.*, No. 11 Civ. 4362 (PKC), 2012 WL 1890388, at *8 (S.D.N.Y. May 23, 2012) ("When a breach of fiduciary duty claim is premised upon fraudulent misconduct, Rule 9(b) applies."). Plaintiffs assert that the "Eichner Defendants" owed TMC a fiduciary duty. *See* SAC ¶¶ 201, 236. But the Eichner Defendants are nine separate Defendants: T. Park and O. Park, the Sponsor of TMC (except during BlueGreen's brief period as the Sponsor); Park Central, the managing member of the Sponsor and a principal of TMC; Marketing and Urban, the sales agent and management company of TMC, respectively; and four individuals who are affiliated with Urban, Marketing, or TMC to various degrees. *Id.* ¶¶ 168–177, 183. No specific Defendant is alleged to have played a role in drafting the content of the annual maintenance fee statements, and Plaintiffs do not allege any facts to support finding a relationship of "trust or confidence" with, or "control and responsibility over," Plaintiffs. *See PetEdge, Inc.*, 234 F. Supp. 3d at 498. *Cf. Caprer*, 825 N.Y.S.2d at 69 ("There is no fiduciary relationship between the sponsor and the condominium.").

Read in the light most favorable to them, Plaintiffs allege that Urban sent the maintenance fee statements by mail or wire to Plaintiffs. *Id.* ¶ 188. This solitary allegation is insufficient to plead the existence of a fiduciary duty owed to them by Urban—much less by all of the Defendants collectively. In the similar context of a condominium, for example, New York courts have held that the managing agent may be fiduciaries to the *condominium*, given the delegation of certain powers to operate and maintain the property in question. *See Makhnevich v. Bd. of Managers of 2900 Ocean Condo.*, 193 N.Y.S.3d 9, 11 (1st Dep't 2023) ("[T]he managing agent is a fiduciary as to the condominium, but not as to the individual unit owners." (quoting *Caprer*, 825 N.Y.S.2d at 69–70)). But Plaintiffs do not cite any authority to support that a managing agent owes a fiduciary duty to unit owners, and the Court is not aware of any. *See id.*

Accordingly, Plaintiffs fail to allege a "scheme to defraud" with the requisite specificity arising out of the maintenance fee statements.[23]

### 2.   Implementation of Reservation System

As pleaded, Plaintiffs' second category of purported predicate racketeering activity, Defendants' implementation of TMC's reservation system, also fails to amount to a "scheme to defraud."  Plaintiffs allege that Defendants did not abide by the Offering Plan and Bylaws governing TMC in implementing the reservation system by

> improperly removing rooms for use by Plaintiffs and other TMC members and advising them that rooms are unavailable for their use when in fact the rooms are being used for the benefit of the Defendant participants in the scheme . . . , offering accommodations to non-TMC members of the general public more than 48 hours in advance of occupancy, limiting reservations availability to those TMC members who are not only current in their maintenance fee payments but who have prepaid such maintenance fees for the reservation date in a subsequent maintenance fee term, artificially restricting reservations availability to force members to reserve nine to twelfth months in advance of occupancy[,] thus often compelling prepayment of maintenance fees for the subsequent year, and making other material deviations from the published reservations policies by which TMC is bound.

SAC ¶ 3; *see also id.* ¶¶ 204–212.  In short, Plaintiffs complain that, contrary to their expectations, they have experienced significant difficulties in reserving the use of their TMC timeshare interests.

However, these allegations fail to identify a single misrepresentation or other element of deception, as is required to plead a "scheme to defraud."  *See, e.g.*, *Williams*, 889 F.3d at 124–26.

---

[23] Plaintiffs' allegations regarding the "fraudulent" maintenance fee statements also fail to state a RICO claim because they fail to plead scienter.  *See* SAC ¶¶ 188–203.  Plaintiffs allege that Defendants overstated TMC's anticipated revenue and expenses on the annual budget "to maximize the management fee paid to Urban," who is paid a set proportion of TMC's estimated annual operating budget.  *See, e.g.*, *id.* ¶ 190.  In other instances, Plaintiffs similarly allege that the Sponsor might profit from their alleged misconduct.  *See, e.g.*, *id.* ¶ 4 ("[T]he enterprise was used to encourage defaults by Plaintiffs and other TMC members by escalating the annual maintenance fees due to unreasonable levels to enrich the respective Sponsor . . . .").  Even assuming Defendants operated as one united "enterprise," as Plaintiffs do, a general incentive to obtain profit is not in itself sufficient to allege a "strong inference of fraudulent intent."  *See, e.g.*, *Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 423 (E.D.N.Y. 2017) (finding "economic incentive" based on profit from engaging in the alleged misconduct insufficient to give rise to strong inference of fraudulent intent); *see also ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308, 1327 (S.D.N.Y. 1997) ("Although the desire to enhance income may motivate a person to commit fraud, allegations that a defendant stands to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b).").  Plaintiffs do not allege any specific motive and opportunity to defraud on the part of Defendants or allege facts showing "strong circumstantial evidence of conscious misbehavior or recklessness," as required.  *See S.Q.K.F.C., Inc.*, 84 F.3d at 634.

Plaintiffs identify specific examples of Defendant Urban, as the management company of TMC,[24] "fraudulently" denying Plaintiffs' TMC reservation requests because no rooms were available:  As a representative example, Plaintiff "Peter C. Brown . . . called reservations in March 2018 and in October 2018 to reserve a room but was told no rooms were available on the dates he sought."  *Id.* ¶ 206.  Plaintiffs do not allege that rooms were, in fact, available to fulfill each reservation request. Rather, Plaintiffs find fault with *why* no rooms were available:  Defendants' alleged use of rooms for TMC members "for their own uses," including "profit from rental of such rooms to transient guests."  *Id.* ¶ 207.  Plaintiffs also complain of experiencing significant difficulties in making reservations on short notice[25] or being made or asked to pay their maintenance fees early. *Id.* ¶ 207– 208, 210.  But these issues, taken as true, still fail to point to any actual misrepresentation or deception.  Plaintiffs therefore fail to plead a "scheme to defraud" adequate to meet the heightened pleading burden of Rule 9(b).[26]  *See ATSI Commc'ns, Inc.*, 493 F.3d at 99; *see also Bigsby*, 298 F. Supp. 3d at 721 (holding RICO claims failed because the alleged scheme "consisted of, at most, breaches of . . . contracts rather than fraud").

### 3.   *Buyback Program*

Plaintiffs' third category of purported predicate racketeering activity is Defendants' "fraudulent" buy-back offers—that is, offers to buy back the TMC timeshare interests from TMC

---

[24] Plaintiffs' allegations of Urban's role in the "fraudulent" conduct contradicts Plaintiffs' allegation, in another part of the Second Amended Complaint, that Urban "performs no work for its management fee."  SAC ¶ 259.

[25] Plaintiffs complain that, from 2011 to 2020, they were often unable to make same-day or short-notice reservations at TMC but instead often had to make reservations nine, sometimes twelve, months in advance.  SAC ¶ 273.  Notably, the Offering Plan appears to encourage owners of timeshare interests to "make a reservation during the priority period," which is "12 months preceding the requested check-in date if the request is for seven (7) consecutive nights or 9 months preceding the requested check-in date if the request is for less than seven (7) consecutive nights," and warns that a TMC member who fails to make a reservation during that period "may not be able to obtain the requested reservation."  2012 Offering Plan at 94.

[26] The actual potential misrepresentations made by Defendants appear to have occurred at the time of Plaintiffs' purchase of the TMC timeshare interests, whether during the sales pitch or in the Offering Plan.  *See* SAC ¶¶ 205, 206(a), 206(h), 206(k), 207 (alleging Defendants were acting "contrary to the inducement [Plaintiff] was promised when purchasing his timeshare interest" or in violation of the Offering Plan).  As the Court notes below, *see infra* note 30, Plaintiffs do not assert that these were the misrepresentations underlying their RICO claim, do not plead the statements at the time of purchase with sufficient particularity, and appear to be time barred from raising such claims in any case.

members, including Plaintiffs, who are in arrears on the payment of their maintenance fee statements in exchange for $100 and forgiveness of the arrearages.  SAC ¶ 213; *see also id.* ¶¶ 217–218 (exemplar list of "fraudulent TMC buy back offers").  Here, too, Plaintiffs fail to adequately plead the existence of a "scheme to defraud."  *See, e.g.*, *Farag*, 2023 WL 2770219, at *1 (rejecting RICO claim based on alleged scheme forcing plaintiff to sell shares in a cooperative at a depressed price, where complaint did not explain how plaintiff was deceived or defrauded).

First, Plaintiffs assert that Defendants' buy-back offers were "fraudulent" because they violate the terms of the NYAG's Assurance of Discontinuance, which precludes the Eichner Defendants[27] and their agents and employees, including TMC, from "engag[ing] in any act directly or indirectly relating to the offer, purchase, sale, issuance, advertisement, marketing, promotion, distribution, negotiation, exchange or transfer of any timeshare interest . . . ."  AOD ¶ 61.  Plaintiffs misunderstand the word "fraudulent":  not every breach of an agreement or a law is fraudulent. Even if the Court were to assume that the buy-back offers are prohibited by the Assurance of Discontinuance, that a conduct is prohibited by an agreement or by the law does not in itself make the conduct a "scheme to defraud," though the alleged non-compliance may form the basis for an enforcement proceeding by the NYAG based on the Assurance of Discontinuance.  *See, e.g.*, *McLaughlin*, 962 F.2d at 192–93 (finding failure to plead mail fraud for RICO claim, though "[i]t is possible that this allegation states a claim for breach of contract").

Second, Plaintiffs assert that the buy-back offers were "fraudulent" because the Sponsors of TMC[28] failed to disclose certain information, including that the buy-back offers would benefit the Sponsors but not TMC.  SAC ¶¶ 215–216.  As already discussed in the context of the maintenance fee statements, this asserted failure to disclose fails to plead the existence of a "scheme to defraud"

---

[27] Plaintiffs allege that the AOD only precludes the Individual Eichner Defendants, but the AOD itself extends to all Eichner Defendants.  *Compare* SAC ¶ 214 *with* AOD ¶ 61.

[28] T. Park and O. Park, and separately BlueGreen, were Sponsors at various points in time.  SAC ¶¶ 168–169, 178.

for multiple reasons, including that Plaintiffs fail to plead the existence of a fiduciary duty—or some other duty to disclose such information—that any Defendant owes to Plaintiffs.  *See, e.g.*, *PetEdge, Inc.*, 234 F. Supp. 3d at 498 (finding no fiduciary duty in "an arms-length commercial transaction").[29]

Accordingly, Plaintiffs' RICO claim is dismissed for failing to plead the existence of a pattern of racketeering activity.  Specifically, Plaintiffs rely on alleged violations of mail or wire fraud as the predicate racketeering as the basis of their RICO claim and yet fail to allege, with the required particularity under Rule 9(b), why any particular statement at issue was fraudulent such that it might constitute a violation of the federal mail or wire fraud statute.[30]

### 4.    *Failure to Allege Existence of Enterprise*

Plaintiffs' RICO claim also fails because Plaintiffs still fail to plead the existence of an "enterprise," as required to establish a RICO violation.

The Court previously dismissed Plaintiffs' RICO claim in part for failure to "explain each participant's role in the alleged course of fraudulent or illegal conduct," as is required to plead an "enterprise" to state a RICO claim based on mail or wire fraud.  *See* First MTD Opinion at 8–10. The Court noted that, while Plaintiffs "describe[d] how each defendant is involved with TMC—i.e.,

---

[29] Plaintiffs also fail to plead any proximate cause, in that there is no allegation of any effect that this purported failure to disclose the Sponsors' financial benefit from the buy-back offers had on Plaintiffs, much less an injury to Plaintiffs.  *See Empire Merchants, LLC*, 902 F.3d at 141.

[30] While the alleged "fraudulent" statements forming the basis of Plaintiffs' RICO claim are the maintenance fee statements, implementation of the timeshare reservation system, and offers to buy back Plaintiffs' timeshare interests, any actual misrepresentations and omissions appear to have occurred during sales presentations of the TMC timeshare interests. SAC ¶¶ 221–223.  For example, the Eichner Defendants, through employees of Defendant Marketing and Urban, purportedly stated that the annual maintenance fee, initially several hundred dollars a year, would not increase at a rate faster than the cost of living—and that, in fact, the fee would likely decrease as additional TMC timeshare interests were sold. *Id.* ¶¶ 228–229.  Plaintiffs do not rely on the sales presentations to form the basis of their RICO claim, however. *See id.* ¶¶ 290–307 (asserting RICO cause of action).  This may be because such statements would likely be barred under the four-year statute of limitations for RICO claims.  *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013) ("The statute of limitations for a civil RICO claim is four years."); SAC ¶ 14 (alleging Plaintiff Charles R. Acklin purchased TMC timeshare interest in 2000).  In any case, any assertion of a RICO claim based on these earlier statements must fail because Plaintiffs do not plead them with the particularity required by Rule 9(b).  The Court also notes that the Offering Plan explicitly warns, in a section titled "Special Risk Factors," that "there is no established market for the rental or resale of Ownership Interests and the rental and resale value, if any, is uncertain."  2012 Offering Plan at 3.  The Offering Plan also explicitly disclaims the existence of any "formal program pursuant to which Sponsor agrees to buy-back any Ownership Interest."  *Id.*

the hierarchy and organization," they failed to explain each Defendant's role in the alleged fraudulent scheme and instead "lump[ed] together each defendant . . . for nearly every allegation." *Id.* at 9.[31]

For the purposes of a RICO claim, an "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). While the "statute does not specifically define the outer boundaries of the 'enterprise' concept," *Boyle v. United States*, 556 U.S. 938, 944 (2009), in general, "RICO requirements are most easily satisfied when the enterprise is a formal legal entity," *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004). The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. *United States v. Turkette*, 452 U.S. 576, 583 (1981). "Where a plaintiff fail[s] to provide . . . any solid information regarding the hierarchy, organization, and activities of [an] alleged association in fact and fail[s] to explain each participant's role in the alleged course of fraudulent or illegal conduct, there is no basis to support the conclusion" that the individuals in question were part of the enterprise. *Beter v. Murdoch*, No. 17 Civ. 10247 (GBD), 2018 WL 3323162, at *6 (S.D.N.Y. June 22, 2018) (alteration in original) (internal quotation marks omitted) (quoting *First Cap. Asset Mgmt.*, 385 F.3d at 174), *aff'd*, 771 F. App'x 62 (2d Cir. 2019).

The Second Amended Complaint continues to suffer from the same deficiencies identified in the First Amended Complaint. Plaintiffs assert, as before, that TMC is a RICO "enterprise." SAC ¶ 1. While it explains the relationship of each Defendant to TMC, the Second Amended Complaint still attributes much of the alleged conduct underlying Plaintiffs' RICO claim to an oft-undefined subset of Defendants. *Compare id.* ¶¶ 162–183 (description of each Defendant), *with id.*

---

[31] The First MTD Opinion did note that Plaintiffs made some specific allegations tied to Bluegreen, which the Court addresses separately below.

¶¶ 2, 4 (attributing misconduct to "the enterprise," "through the respective Sponsor's control of TMC's Board of Directors and the management company") *and id.* ¶¶ 201, 209 (attributing misconduct to the Eichner Defendants as a whole).  Plaintiffs therefore continue to lump Defendants together and fail to distinguish among them consistently.

As a result, it is often difficult to untangle which specific Defendant engaged in what action. With respect to the maintenance fee statements, for example, Plaintiffs seemingly attribute the "fraudulent" behavior to no one in particular, *id.* ¶¶ 190, 193 (using passive voice in describing alleged misconduct), non-Defendant actors, *id.* ¶ 194 (attributing alleged misconduct to "TMC's billing office" and "TMC"), or an ill-defined combination of Defendants and potential non-Defendants, such as "TMC employees and agents, reviewed and adopted by TMC's Board of Directors (which was controlled by the respective Sponsor, including various Eichner Defendants and BlueGreen at respective times)," *id.* ¶ 203.  Plaintiffs' inconsistent references to who among the Eichner Defendants served as TMC's Sponsor also further highlights Plaintiffs' failure to distinguish among the Eichner Defendants, much less attribute specific conduct to each Defendant.  *See, e.g.*, *id.* ¶¶ 7, 183, 220 (referencing Eichner Defendants as the Sponsor); *id.* ¶¶ 162–169 (identifying T. Park and O. Park as Sponsors but not other Eichner Defendants); *id.* ¶ 214 (seemingly referring to the Individual Eichner Defendants as the Sponsor).

In short, Plaintiffs apparently seek to impute the actions of each Defendant to all other Defendants by virtue of their relationship to each other.  But because the Second Amended Complaint does not meet Rule 9(b)'s pleading requirements, the Court remains in the dark as to what specific actions Defendant Ian Bruce Eichner took, for example, as part of the "enterprise." The same can be said of each of the nine other Defendants.[32]  Such vagueness is not sufficient to

---

[32] At best, Plaintiffs single out Urban, among the Eichner Defendants, for its actions as the management company of TMC.  Plaintiffs allege that Urban sent out the maintenance fee statements and is paid a certain percentage of TMC's estimated annual operating budget (which purportedly creates an incentive for charging higher maintenance fees), that

satisfy the requirements of pleading a RICO claim.  *See, e.g.*, *Beter*, 2018 WL 3323162, at *6

("Plaintiff[']s complaint does not contain any allegations of specific actions [a certain individual

defendant] took or explain why he should be characterized as a ringleader.").

As in the First Amended Complaint, Plaintiffs make some allegations specific to BlueGreen.

*See* First MTD Opinion at 9 ("The only possible exception to Plaintiffs' lumping [together of

Defendants] are the allegations pertaining to BlueGreen.").  BlueGreen became a TMC Sponsor in

June 2018 for an unspecified period of time.  SAC ¶ 178 (June 2018); *id.* ¶ 220 (referencing "the

Eichner Defendants after they resumed control as TMC's Sponsor").  As a Sponsor, BlueGreen was

empowered to appoint a majority of the Board of Directors of TMC.  *Id.* ¶ 283.  Plaintiffs allege

that, during its time as a Sponsor, BlueGreen "ratified and continued the wrongful practices

established and used by the [Individual Eichner Defendants][33] as regards charging fraudulently

determined annual maintenance fees, employing a fraudulent reservations scheme, and making

fraudulent buy back offers . . . ."  *Id.* ¶ 179; *see also id.* ¶ 277 (noting Plaintiffs continued to have

difficulties making reservations during BlueGreen's tenure as Sponsor).

Plaintiffs provide virtually no other detail regarding any conduct attributable specifically to

BlueGreen.  Plaintiffs allege that they continued to have difficulties making reservations during

BlueGreen's tenure as a Sponsor, but Plaintiffs do not allege anything BlueGreen actually *stated* or

*did* in relation to the reservations.  *Id.* ¶ 277.  Plaintiffs also allege that BlueGreen failed to replace

Urban as TMC's management company or reduce Urban's management fees.  *Id.* ¶¶ 182, 287–289.

But Plaintiffs do not identify any promise or representation by BlueGreen to take such action, much

---

Urban denied Plaintiffs' TMC reservation requests, and that Urban sent buy-back offers to Plaintiffs.  SAC ¶¶ 188–191, 204, 206, 217.  These allegations do not cure the deficiencies as to the other Eichner Defendants, and they also nonetheless fail to state a RICO claim against Urban for the substantive reasons already described.

[33] In perhaps yet another exemplar of the lack of specificity in the Second Amended Complaint, Plaintiffs use the term "Eichner Respondents" here, which Plaintiffs define as solely the Individual Eichner Defendants.  *See* SAC ¶¶ 5 n.3, 179. It is unclear why Plaintiffs leave out the other Eichner Defendants, such as Mr. Lager, T. Park and O. Park (the Sponsors), and the other Defendant entities.

less who, when, where, and how such a statement was made.  Accordingly, Plaintiffs' allegations regarding BlueGreen fail to plead the particularity required by Rule 9(b).[34]

For the reasons detailed above, Plaintiffs' RICO claim is dismissed for failing to plead the existence of a RICO enterprise.

###    B.    Plaintiffs' Claim of Conspiracy Under RICO

Plaintiffs also assert a claim of conspiracy to violate RICO based on the same underlying alleged RICO violations as Plaintiffs' RICO claim.  *See* SAC ¶¶ 308–317; *see also* 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions [of RICO].").  Because Plaintiffs have failed to plead a RICO violation, Plaintiffs' RICO conspiracy must also be dismissed.  *See, e.g.*, *Williams*, 889 F.3d at 126 (affirming dismissal of RICO conspiracy claim based on "agreement to commit the same substantive RICO violations . . . deemed insufficiently pled, [where] plaintiffs have not alleged any further acts that, if carried out, would have satisfied RICO's requirement of a pattern of racketeering"); *Beter*, 2018 WL 3323162, at *6 ("[T]he failure to state a claim for a substantive RICO violation, moreover, is fatal to [Plaintiff's] RICO conspiracy claim." (alteration in original) (internal quotation marks and citation omitted)).

###    C.    Supplemental Jurisdiction

Plaintiffs assert federal jurisdiction on the basis of federal question jurisdiction as to Plaintiffs' RICO claims.  SAC ¶ 184.  Plaintiffs also seek the Court's exercise of supplemental jurisdiction over the remaining state law claims.  *Id.* ¶ 185.  The Court declines to do so.

---

[34] While the Court accepts as true Plaintiffs' allegations for the purposes of this analysis, Plaintiffs' failure to plead any facts related to BlueGreen with particularity and simply asserting that BlueGreen continued the same conduct as the Eichner Defendants is especially puzzling given that BlueGreen is an unaffiliated third party approved by the NYAG to *replace* the Eichner Defendants.  AOD ¶ 62 ("Respondents shall enter into an agreement with the third-party operator of timeshare properties . . . previously identified to the [NYAG] . . . or to such other third party purchaser approved by the [NYAG] . . . .").  BlueGreen in fact appears to have replaced the majority of TMC's Board of Directors, including Defendants Stuart Eichner and Mr. Lager, in 2018, upon becoming a Sponsor, *see* SAC ¶¶ 283, 183; *see also* Dkt. No. 111-8 (BlueGreen purchase agreement dated March 15, 2018), and entered into an arbitral dispute against Urban in October 2019 over the management fee and management contract for TMC, *see* SAC ¶ 298.

In an action where a district court has original jurisdiction because one or more federal claims are asserted, the court also has supplemental jurisdiction over any state law claims that are "so related" to the federal claims "that they form part of the same case or controversy . . . ." *See* 28 U.S.C. § 1367(a).  Nonetheless, the court may decline to exercise supplemental jurisdiction over such state law claims if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*Id.* § 1367(c).  "The exercise of supplemental jurisdiction is left to the discretion of the district court . . . ."  *First Cap. Asset Mgmt.*, 385 F.3d at 182 (citation omitted).

Here, by dismissing Plaintiff's RICO claims, the Court "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  In deciding whether to exercise supplemental jurisdiction, the Court must "weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants."  *First Cap. Asset Mgmt.*, 385 F.3d at 183 (quoting *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994)).  In applying these factors, the Second Circuit has counseled that, "[i]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  *Id.* (quoting *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991)).  The Court has dismissed all of Plaintiffs' federal claims at the pleading stage, and there is no other basis for federal subject matter jurisdiction over this case.  The Court declines to exercise its supplemental jurisdiction over Plaintiffs' state law claims.

Accordingly, Plaintiffs' state law claims are dismissed without prejudice.  *See Green v. Dep't of Educ. of City of New York*, 16 F.4th 1070, 1074 (2d Cir. 2021) ("[D]ismissals for lack of subject matter

jurisdiction 'must be without prejudice, rather than with prejudice.'" (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54 (2d Cir. 2016)).

### D.     Leave to Amend

Although leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), "it is within the sound discretion of the district court to grant or deny leave to amend," *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019).  Here, the Court denies leave to amend the complaint.

The problems with Plaintiffs' RICO claims are substantive, so amendment would be futile. *See, e.g., Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("[B]etter pleading will not cure [the complaint].  Repleading would thus be futile.  Such a futile request to replead should be denied."); *see also Roundtree v. City of New York*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (collecting cases).  Plaintiffs have already amended the complaint numerous times, including after the benefit of the Court's analysis on Defendants' first motions to dismiss.  *See* Dkt. Nos. 1, 16, 17, 104, 105, 108, 109, 111.  Yet, the same core deficiencies remain.  *See, e.g.*, *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 415 (S.D.N.Y. 2013) ("Plaintiff's failure to fix deficiencies in its previous pleadings is alone sufficient ground to deny leave to amend sua sponte."); *see also Bui v. Indus. Enters. of Am., Inc.*, 594 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) ("A complaint may be dismissed with prejudice 'where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible.'" (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988))).

Nor do Plaintiffs suggest that they are in possession of facts that would cure the problems with any of their claims, especially their RICO claims.  *See, e.g.*, *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505–06 (2d Cir. 2014) (affirming denial of leave to replead where plaintiff already amended once following a motion to dismiss and failed to identify how it would cure its pleading deficiencies);

*see also Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) ("A plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint."), *aff'd*, 619 F. App'x 34 (2d Cir. 2015).  Notably, Plaintiffs only request leave to amend the Second Amended Complaint in connection with the BlueGreen Motion to Dismiss.  BlueGreen Opp. at 25.  The Court's decision today, however, rests largely on the Eichner Motion to Dismiss, and Plaintiffs have not requested leave to amend in the case that the Eichner Motion to Dismiss is granted.  The Court is not obligated to grant leave to amend where there has been no such request for one.  *See Transeo S.A.R.L.*, 936 F. Supp. 2d at 415 (citing *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir.2011)) ("[A] district court has no obligation to grant leave to amend *sua sponte*.").

Accordingly, the Court finds that further amendment of the complaint would be futile and declines to grant Plaintiffs leave to replead.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are GRANTED as to Plaintiffs' RICO claims (First and Second Counts).  Dkt. Nos. 119, 121.  Plaintiffs' RICO claims are dismissed with prejudice.  The Court also declines to exercise supplemental jurisdiction over Plaintiffs' remaining claims and dismisses those claims without prejudice.

The Clerk of Court is directed to enter judgment for Defendants, terminate all pending motions, and close the case.

SO ORDERED.

Dated:  February 26, 2024
New York, New York

_____
GREGORY H. WOODS
United States District Judge